# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARDEN RIDGE CORPORATION, *et al.*, | ) | Case No. 04-10324 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| ———————————— | ) | |
| | ) | |
| DANIEL FERGUSON, | ) | |
| | ) | |
| | ) | Case No. 06-CV-213 (GMS) |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| GARDEN RIDGE CORPORATION, *et al.* | ) | |
| | ) | |
| Appellees | ) | |
| | ) | |
| | ) | |
| ———————————— | ) | |

## BRIEF OF APPELLEES GARDEN RIDGE CORPORATION, *ET AL.*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
Sean T. Greecher (No. 4484)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Co-counsel to the Reorganized Debtors

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Justin G. Brass
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Co-counsel to the Reorganized Debtors

# Table of Contents

Page

STATEMENT OF THE ISSUES....................................................................................1

SUMMARY OF THE ARGUMENTS .........................................................................2

STANDARD OF REVIEW ..........................................................................................4

NATURE AND STAGE OF PROCEEDINGS .............................................................4

    I.       The Chapter 11 Bankruptcy Cases...............................................................4

    II.     Appellant's Motion .......................................................................................5

STATEMENT OF FACTS ...........................................................................................8

ARGUMENTS.............................................................................................................11

    I.       Appellant Waived His Right to an Evidentiary Hearing ...........................12

    II.     Assuming, Arguendo, that the Bankruptcy Court Erred in Not  Conducting
            an Evidentiary Hearing, Such Error was Harmless ...................................16

    III.    The Bankruptcy Court Correctly Construed Setoff Narrowly...................18

    IV.    The Bankruptcy Court Correctly Concluded that  Substantive
            Consolidation Had No Effect on the  Reorganized Debtors' Defense to
            Ferguson's Setoff Claim .........................................................................19

          A.     The Bankruptcy Court Correctly Concluded that the Reorganized Debtors'
                 Plan Expressly Preserved All Defenses to Appellant's  Setoff Claim
                 Notwithstanding Substantive Consolidation of their Estates.........19

          B.     The Bankruptcy Court Correctly Concluded  that Substantive
                 Consolidation Cannot Create  Mutuality Where it Did Not Otherwise Exist
                 ........................................................................................20

    V.     The Bankruptcy Court Properly Considered All Evidence and Correctly
            Concluded that the Facts Do Not Support Appellant's Claim to Setoff....25

    VI.    The Court Correctly Concluded that Equitable Doctrines  Were Not
            Sufficiently Alleged or Supported by Evidence ........................................31

VII.    The Reorganized Debtors are Not Judicially  Estopped from Defending
        Against Appellant's Claim.........................................................................32

VIII.   The Bankruptcy Court Correctly Concluded  That No Permissible
        Triangular Setoff Exists ............................................................................34

CONCLUSION.....................................................................................................36

## Table of Authorities

**Page**

**Cases**

*Anderson v. Bessemer City, N.C.,*
    470 U.S. 564 (1985)............................................................................................25, 26

*Aoude v. Mobil Oil Corp.,*
    862 F.2d 890 (1st Cir. 1988)...............................................................................16

*Baxter Healthcare Corp. v. Medical Laboratory Automation, Inc.,*
    1994 U.S. Dist. Lexis 17651 (N.D. Ill. 1994).......................................................13

*Coast Automotive Group, Ltd. v. VW Credit, Inc.,*
    34 Fed. Appx. 818 (3d Cir. 2002)........................................................................32

*Depositors Trust Co. v.*
    *Frati Enterprises, Inc.,* 590 F.2d 377 (1st Cir. 1979)............................................35

*Drywall Tapers & Pointers Local 1974 v. Local*
    *530* F.2d 69 (2d Cir. 1992)...................................................................................13

*Fengler v. Numismatic Americana, Inc.,*
    832 F.2d 745 (2d Cir. 1987).................................................................................12

*First Card v. Carolan (In re Carolan),*
    204 B.R. 980 (B.A.P. 9th Cir. 1996).....................................................................16

*Greenberg v. Paul Revere Life Insurance Company,*
    91 Fed. Appx. 539 (9th Cir. 2004)........................................................................14

*In re Art Metals U.S.A., Inc.,*
    109 B.R. 74 (Bankr. D. N.J. 1989) .......................................................................18

*In re Bevill, Bresler & Schulman Asset Management Corp.,*
    896 F.2d 54 (3d Cir. 1990)...................................................................................18

*In re Bram,*
    179 B.R. 824 (Bankr. S.D. Tex. 1995) .................................................................18

*In re Braniff Airways, Inc.,*
    42 B.R. 443 (Bankr. N.D. Tex. 1984)...................................................................18

*In re Cooper,*
  147 B.R. 678 (Bankr. D. N.J. 1992) ...........................................................23, 24, 25

*In re Delta Airlines, Inc.*,
  341 B.R. 439 (Bankr. S.D.N.Y. March 23, 2006) ...........................................21, 22

*In re Garden Ridge Corporation,*
  338 B.R. 627 (Bankr. D. Del February 10, 2006)........................................... passim

*In re Lang Machinery Corporation,*
  1988 Bankr. LEXIS 1667, (Bankr. W.D. Pa. 1988) .........................................19, 35

*In re Midland Marina, Inc.,*
  259 B.R. 683 (B.A.P. 8th Cir. 2001).....................................................................16

*In re Murray Industries, Inc.,*
  125 B.R. 314 (Bankr. M.D. Fla. 1991) ............................................................20, 21

*In re Owens Corning,*
  419 F.3d 195 (3d Cir. 2005)..................................................................................25

*In re Video Update, Inc.,*
  2005 U.S. Dist. LEXIS 9559 (D. Del. May 19, 2005) (Sleet, J.).............................4

*In re Virginia Block Company,*
  16 B.R. 560 (Bankr. W.D. Va. 1981) ........................................................18, 34, 35

*Lansford-Coaldale Joint Water Authority v. Tonolli Corporation,*
  4 F.3d 1209 (3d Cir. 1993)....................................................................................26

*Mellon Bank, N.A. v. Metro Comm., Inc.,*
  945 F.2d 641 (3d. Cir. 1991), *cert. denied,* 503 U.S. 937 (1992)............................4

*Montrose Medical Group Participating Savings Plan v. Bulger,*
  243 F.3d 773 (3d Cir. 2001)..................................................................................32

*Panther Systems II, Ltd. v. Panther Computer Systems, Inc.,*
  783 F. Supp. 53, (E.D.N.Y. 1991) .........................................................................13

*Picker Intern'l v. Kodak Caribbean, Ltd.,*
  826 F. Supp. 610 (D.P.R. 1993)............................................................................13

*Semmes Motors, Inc. v. Ford Motor Co.,*
  429 F.2d 1197 (2d Cir. 1970).................................................................................12

DB01:2140151.8                                                                                    062883.1001

*United States v. United States Gypsum Co.*,
   333 U.S. 364 (1948)..................................................................................................26

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969)..................................................................................................26

**Statutes**

11 U.S.C. § 553.........................................................................................................7, 21

28 U.S.C. § 158(a) .........................................................................................................4

28 U.S.C. § 2111..........................................................................................................16

**Rules**

FED. R. BANKR. P. 9005 ...............................................................................................16

FED. R. CIV. P. 61 .......................................................................................................16

FED. R. EVID. 201 ........................................................................................................18

## STATEMENT OF THE ISSUES

1.    Whether the Bankruptcy Court correctly determined not to conduct an evidentiary hearing since (i) Appellant was given an opportunity for an evidentiary hearing but declined and thereby waived his rights, and (ii) no substantial right of Appellant was affected in not conducting an evidentiary hearing because he was permitted to and did submit all evidence in his post-hearing submission that he would have presented at an evidentiary hearing.

2.    Whether the Bankruptcy Court correctly held that substantive consolidation did not create mutuality for purposes of setoff when (i) the Reorganized Debtors expressly reserved their defenses to Appellant's setoff claim notwithstanding substantive consolidation, and (ii) relevant case law supports the proposition that substantive consolidation cannot create mutually for setoff purposes where it otherwise does not exist.

3.    Whether the Bankruptcy Court appropriately and correctly found certain equitable doctrines to be inapplicable, since Appellant failed to allege necessary elements of those equitable doctrines.

4.    Whether the Bankruptcy Court correctly determined that the requisite element of mutuality was lacking for purposes of setoff when the evidence established that Appellant's severance claim was against his employer, Garden Ridge Management, Inc., whereas the claim against Appellant was by Garden Ridge, L.P. – a separate and distinct legal entity.

5.    Whether judicial estoppel can correctly preclude the Reorganized Debtors from arguing in this dispute that Garden Ridge Management, Inc. is a separate and distinct legal

entity that employs all Garden Ridge employees when the Reorganized Debtors have taken that same position throughout the entirety of their bankruptcy proceedings.

      6.     Whether the Bankruptcy Court correctly concluded that no permissible triangular setoff exists when (i) there is no case law that supports Appellant's position in this regard, and (ii) there is no evidence that Garden Ridge, L.P. and Garden Ridge Management, Inc. agreed to be treated as a single entity with respect to the claims by and against Appellant.

## SUMMARY OF THE ARGUMENTS

      1.     A party waives his right to an evidentiary hearing where he (i) is demonstrably content to rest on documents submitted to the Court, (ii) is given an opportunity for an evidentiary hearing and refuses, and (iii) actively participates in post-argument submission of evidence without objection or request for an evidentiary hearing.  Here, Appellant waived his right to an evidentiary hearing.

      2.     A harmless error – one that does not affect a substantial right of a party – is not grounds for reversal on appeal.  Here, Appellant concedes that he submitted all evidence to the Bankruptcy Court that he would have otherwise submitted at an evidentiary hearing and that all such evidence is uncontradicted.  Therefore, assuming the Bankruptcy Court erred in not conducting an evidentiary hearing, such error was harmless as to Appellant since it affected no substantial right.

      3.     The Bankruptcy Court correctly concluded that substantive consolidation of the Reorganized Debtors' estates had no effect on the Reorganized Debtors' defense to Appellants setoff claim since (i) the Reorganized Debtors expressly reserved their defenses to Appellant's claim in their Plan, and (ii) relevant case law does not support the proposition

2

advanced by Appellant that substantive consolidation can create mutuality where it otherwise does not exist.

        4.     The Bankruptcy Court correctly concluded that no "mutuality" exists for purposes of setoff since Ferguson's claim for severance is against his former employer, Garden Ridge Management, Inc. and the Note is due to Garden Ridge L.P.; two distinct legal entities.

        5.     Where there are two permissible views of evidence, the trier of fact's adoption of one over the other is not grounds for reversal even where the reviewing court would have weighed the evidence differently. The Bankruptcy Court determined that the overwhelming evidence showed that Garden Ridge Management, Inc. was a separate entity and was Appellant's employer, notwithstanding Appellant's arguments and purported beliefs to the contrary.

        6.     The Bankruptcy Court correctly concluded that Appellant failed to establish the applicability of certain equitable doctrines since Appellant did not allege – much less prove – sufficient facts to support those doctrines.

        7.     Judicial estoppel does not preclude the Reorganized Debtors from arguing that Garden Ridge Management, Inc. is a separate and distinct legal entity since (i) Appellant conceded that fact, and (ii) the Reorganized Debtors' position has consistently been throughout their bankruptcy cases that Garden Ridge Management, Inc. is a separate legal entity that employs all Garden Ridge employees.

8.    The Bankruptcy Court correctly concluded that no permissible triangular setoff exists since (i) no relevant case law supports Appellant's proposition that his subject belief controls, and (ii) there is no formal agreement establishing that the parties intended to treat Garden Ridge Management, Inc. and Garden Ridge, L.P. as one entity for any purpose.

<u>**STANDARD OF REVIEW**</u>

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a). *In re Video Update, Inc.*, 2005 U.S. Dist. LEXIS 9559, *2 (D. Del. May 19, 2005) (Sleet, J.).[1] "In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous." *Id. (citation omitted)*. "[A] Bankruptcy Court's conclusions of law are subject to plenary review." *Id.* "Mixed questions of law and fact are subject to a 'mixed standard of review.'" *Id. quoting Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 641-642 (3d. Cir.1991), *cert. denied*, 503 U.S. 937 (1992). "Under this 'mixed standard of review,' the appellate court accepts findings of 'historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts.'" *In re Video Update, Inc.*, 2005 U.S. Dist. LEXIS 9559, *3 *quoting Mellon Bank*, 945 F.2d at 641-642 (editing in *Video Update*).

<u>**NATURE AND STAGE OF PROCEEDINGS**</u>

**I.    <u>The Chapter 11 Bankruptcy Cases</u>**

On February 2, 2004 (the "Petition Date"), Appellees Garden Ridge, L.P., Garden Ridge Corporation, Garden Ridge Management, Inc., Garden Ridge Finance Corporation and Garden Ridge Investments, Inc. (collectively, with Garden Holdings, Inc., prior to the Effective

---

[1] Pursuant to D. Del. LR 7.1.3(7), a copy of *Video Update* is annexed hereto as Exhibit A.

Date (as defined below), the "Debtors," and after the Effective Date, the "Reorganized Debtors"), filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Garden Holdings, Inc. filed its voluntary petition on February 4, 2004.

The Reorganized Debtors own and operate a leading home décor retailer with 34 stores in 13 states throughout the South, Midwest and Mid Atlantic regions.

On March 29, 2005, the Debtors filed their *First Amended Joint Plan of Reorganization (Corrected) Under Chapter 11 of the Bankruptcy Code* (the "Plan"). By order dated April 28, 2005 (the "Confirmation Order"), the Bankruptcy Court confirmed the Plan. The effective date of the Plan was May 12, 2005 (the "Effective Date"). According to the Plan, claimants holding general unsecured claims of $37,000 or less will receive a cash dividend of approximately 10%, whereas claimants holding general unsecured claims greater than $37,000 will receive a distribution of preferred shares of stock in the reorganized entity.

## II.    Appellant's Motion

On April 14, 2005, Appellant Daniel Ferguson ("Appellant" or "Ferguson") filed his *Motion of Daniel Ferguson for Relief from the Automatic Stay Under § 362(d)(1) of the Bankruptcy Code to the Extent Necessary to Set Off Mutual Debts* in the Bankruptcy Court (the "Motion") [*see* Amended Designation No. 1].[2] By his Motion, Appellant sought authority to set off a debt allegedly owed to him by Garden Ridge Management, Inc. with a liability Appellant owes to Garden Ridge, L.P.

---

[2] *Amended Designation of Record and Statement of Issues on Appeal* filed with this Court on March 7, 2006 (the "Amended Designation") [*see* D.I. 3].

The Reorganized Debtors filed an objection (the "Objection") to the relief requested in the Motion on June 10, 2005 [*see* Amended Designation No. 2] to which Appellant replied on June 22, 2005 (the "Reply") [*see* Amended Designation No. 3].

Following the completion of discovery, the Bankruptcy Court heard oral argument at a hearing held on November 16, 2005 (the "Hearing").[3] At the Hearing, the Court indicated that it did not intend to hold an evidentiary hearing that day and gave the parties the opportunity adjourn the matter to another date to conduct a full evidentiary hearing. *See* Hearing Tr. at p. 54, ln. 11-17. Appellant agreed that the matter should be argued on the merits at the Hearing rather than adjourned to a later date for a full evidentiary hearing.[4] *See Id.* at ln. 18-19.

At the conclusion of oral argument, the Bankruptcy Court requested that the parties submit post-hearing briefs in support of their positions, along with any evidence the Court should consider in rendering a decision on the Motion. At no time did Appellant request an evidentiary hearing or object to this process. In fact, counsel to Appellant clarified that "then each party can submit their own documents, is that what I understand?" Hearing Tr., at p. 73, ln. 18-19.[5]

---

[3] References to the transcript of the Hearing will be referred to as "Hearing Tr. at ___". A copy of the transcript of the Hearing was included as Exhibit B to Appellant's opening brief and is item 22 of the Amended Designation.

[4] In his opening brief, Appellant states that the Bankruptcy Court "would not hold an evidentiary hearing..." Opening Brief, at p. 4. Although likely inadvertent, this characterization gives the impression that the Bankruptcy Court refused to hold an evidentiary hearing. In fact, as noted above, the Bankruptcy Court offered Appellant an evidentiary hearing but Appellant advised that the Motion could "be decided on the papers" and that the parties should "argue it today." Hearing Tr., at p. 54, ln. 2-3, 18-19.

[5] A typographical error in the transcript attributes this quote to Mr. Barry, when, in fact, it is Mr. Sullivan, counsel to Appellant, speaking.

On November 30, 2005, the Reorganized Debtors and Appellant each filed post-argument briefs in support of their respective positions (the "Debtors' Post-Hearing Brief" and "Ferguson Post-Hearing Brief," respectively) [*see* Amended Designation Nos. 23 & 24]. The Reorganized Debtors submitted approximately 40 pages of supporting documentary evidence (including a supporting affidavit), whereas Appellant submitted a 537-page appendix of supporting evidence.

On February 10, 2006, the Bankruptcy Court issued its *Memorandum of Opinion and Order* (the "Order") [*see* Amended Designation No. 27] denying the Motion.[6] *See In re Garden Ridge Corporation*, 338 B.R. 627 (Bankr. D. Del February 10, 2006). In the Order, the Bankruptcy Court, applying Texas law and 11 U.S.C. § 553, found, among other things, that (i) "it is undisputed that the full face amount of the Note remains due" (*see id.* at 631); (ii) mutuality of obligation does not exist as between the severance and relocation pay claimed by Appellant and Appellant's obligation to Garden Ridge, L.P. (*see id.* at 635); (iii) allowing Appellant to setoff the respective claims would be an impermissible triangular set off to which no exception applies (*see id.* at 636); and (iv) substantive consolidation of the Reorganized Debtors' estates did not support Appellants' asserted setoff claim since, in the Reorganized Debtors' confirmed plan of reorganization, the Reorganized Debtors preserved their defenses to Appellant's claim of setoff and substantive consolidation could not create mutuality where it otherwise did not exist (*see id.* at 640-641). On February 14, 2006, the Bankruptcy Court entered a judgment (the "Judgment") [*see* Amended Designation No. 28] against Appellant finding that Appellant's

---

[6] A copy of the Order is included as Exhibit C to Appellant's opening brief. Since citations in this brief are to the reported Order, a copy of the reported Order is annexed hereto as Exhibit B.

7

"motion for relief from stay in order to effectuate a setoff is not well premised and is hereby denied." *In re Garden Ridge Corporation,* 338 B.R. at 642. This appeal timely followed.

## STATEMENT OF FACTS[7]

Garden Ridge Management, Inc. is a management services company that employs all of the staff and management utilized at the Garden Ridge stores. *See* Shafer Aff., at ¶ 7.[8] Garden Ridge, L.P., the entity that operates all of the Garden Ridge stores, pays Garden Ridge Management, Inc. a fee for the use of Garden Ridge Management, Inc.'s employees in its stores. *See id.*

Garden Ridge, L.P. has none of its own employees. *See id.* at ¶ 8. Although the officers of Garden Ridge Management, Inc. act as the officers of Garden Ridge, L.P., they receive no compensation or benefits from Garden Ridge, L.P. and are not employed by Garden Ridge, L.P. *See id.* at 10. The parties do not dispute that Garden Ridge Management, Inc. and Garden Ridge, L.P. are separate legal entities. *See* Hearing Tr. at p. 59, ln. 13-15 ("THE COURT: Mr. Sullivan, is Garden Ridge Management as well as Garden Ridge, L.P., are they separate legal entities? MR. SULLIVAN: Yes, they are, Your Honor.").

Ferguson was hired as the Debtors' Senior Vice-President of Supply Chain in January of 2001. *See* Motion, at ¶ 3. Ferguson held the title of Senior Vice-President of Supply Chain and was, at all times, an officer. *See* Transcript of Deposition of Daniel Ferguson, *In re Garden Ridge Corporation,* Ch. 11 Case No. 04-10324 (RB) (Bankr. D. Del. October 27, 2005)

---

[7] To the extent the facts set forth in this section are derived from Ferguson's deposition testimony, documents filed by Ferguson or arguments of counsel, the Reorganized Debtors believe that they are undisputed.

[8] References to "Shafer Aff." are to the *Affidavit of Holly Shafer in Support of Reorganized Debtors' Post Hearing Memorandum* (the "Shafer Affidavit") annexed to the Debtors' Post-Hearing Brief as Exhibit A [*see* Amended Designation No. 23].

(the "Ferguson Tr."), at p. 11, ln. 18-19 ("Q: Were you an officer? A: Yes.").[9] Ferguson has

asserted that his general responsibilities as Senior Vice-President of Supply Chain included "over

all distribution, transportation, both domestic and international…[and] was also responsible

for…[the] merchandise service center[]" and that he "deal[t] with many different deals from

capital expenditures and capital requests to real estate acquisitions, to expansion, to financial

reporting, to operating…" Ferguson Tr., at p. 12, ln. 16-20 and p. 65, ln. 14-20.

Ferguson "served on the Debtors' Executive Committee." Motion, at ¶ 3.

According to Ferguson, the Executive Committee "consisted of the CEO, president,…chief

financial officer, senior VP of stores, EVP of information technology, senior vice president of

human resources, senior vice president of supply chain, [and] senior vice president of

marketing…" Ferguson Tr., at p. 32, ln. 5-11. According to Ferguson, "the executive committee

was accountable to the board[]" and made recommendations to the board regarding, among other

things, "marketing strategy, capital expenditures, store expansion, [and] systems

improvements…" and had decision-making authority over the Debtors. Ferguson Tr., at p. 32,

ln. 13-14, 22-24, and p. 33, ln. 1-2.

Ferguson's paychecks all named "Garden Ridge Management, Inc." as his

employer. *See* Exhibit 3 to the Debtors' Post-Hearing Brief; Exhibit B to the Objection;

Ferguson Tr., at p. 26, ln. 11-14, 18-20 ("Q: Do you have any reason to dispute that this is an

accurate copy of your pay stub for that period? A: No, I don't.…Q: Do you recall ever

receiving a paycheck that looked any different from this in form? A: No."). Ferguson's W-2

forms all named "Garden Ridge Management, Inc." as his employer. *See* Exhibit 4 to Debtors'

---

[9] The relevant pages of the Ferguson Transcript are annexed as Exhibit 2 to the Debtors' Post-Hearing Brief [*see* Amended Designation No. 23].

Post-Hearing Brief. Ferguson only had one employer in 2003. *See* Ferguson Tr., at p. 31, ln. 18-19 ("Q: You only had one employer in 2003? A: Yes.").

Despite the foregoing, Ferguson claims to not know who Garden Ridge Management, Inc. is and claims not to recall ever even hearing the name "Garden Ridge Management, Inc." *See* Ferguson Tr., at p. 23, ln. 12-13 ("Q: And who is Garden Ridge Management, Inc.? A: I'm not sure."); Ferguson Tr., p. 39, ln. 10-12 ("Q: Have you ever heard the name Garden Ridge Management, Inc. before the bankruptcy? A: Again, I don't recall. However, I may have.").

Nothing in Ferguson's employment agreement entitles him to receive a loan from Garden Ridge, L.P. *See* Ferguson Tr., at p. 22, ln. 9-15 ("Q: Can you show me where in this agreement it says you're entitled to a $250,000 note from Garden Ridge, L.P.? A: No. Q: Why is that? A: Because it was not a part of the employment agreement.").

On March 8, 2001, Ferguson caused a loan to be issued to himself from Garden Ridge, L.P. evidenced by a note (the "First Note") in favor of Garden Ridge, L.P. in the amount of $250,000.00, plus interest at a rate of 5.75% per annum. *See* Exhibit 5 to Debtors' Post-Hearing Brief; Exhibit 2 to *Appendix to Movant Daniel Ferguson's Post-Hearing Brief* (the "Ferguson Appendix") [*see* Amended Designation No. 25]. On January 1, 2002, Ferguson caused a second, replacement note to be issued to himself from Garden Ridge, L.P. (the "Second Note") in favor of Garden Ridge, L.P. in the amount of $250,000.00, plus interest at the reduced rate of 2.75% per annum. *See* Exhibit 6 to Post Hearing Brief. On January 1, 2003, Ferguson caused a third, replacement note to be issued to himself from Garden Ridge, L.P. (the "Third Note," and together with the First Note and Second Note, the "Notes") in favor of Garden Ridge,

10

L.P. in the amount of $250,000.00, plus interest at the rate of 2.75% per annum. *See* Exhibit 7 to Debtors' Post-Hearing Brief; Exhibit 4 to Ferguson Appendix.

The parties do not dispute that the Notes were issued by Garden Ridge, L.P. *See* Hearing Tr., at p. 56, ln. 7-19 ("THE COURT: Now, I understand further that the note was issued by Garden Ridge, L.P. Is that correct? MR. SULLIVAN: That's correct, Your Honor."). Ferguson has made no payments on any of the First Note, Second Note or Third Note, and the full balance of the Third Note remains due and owing. *See* Motion, at ¶ 7; Appellant's Opening Brief, at p. 9, ¶ 8.

Despite having taken three separate notes from Garden Ridge, L.P., Ferguson claims to not know who Garden Ridge, L.P. is and claims to not recall ever even hearing the name "Garden Ridge, L.P." *See* Ferguson Tr., at p. 23, ln. 15-16 ("Q: And who is Garden Ridge, L.P.? A: I'm not sure."); Ferguson Tr., p. 39, ln. 7-9 ("Q: So prior to the bankruptcy, had you ever heard the name Garden Ridge, L.P.? A: I don't recall. However, I may have.").

Despite claiming to not know who either Garden Ridge Management, Inc. or Garden Ridge, L.P. are or even recalling hearing those names prior to the Debtors' bankruptcy cases, in September 2003, Ferguson filed suit in the District Court of Harris County Texas, 189th Judicial District specifically naming Garden Ridge Management, Inc. and Garden Ridge, L.P. as his employers. *See* Exhibit 8 to Debtors' Post-Hearing Brief, at ¶ XI.

## ARGUMENTS

As if playing school ground kick ball, the instant appeal represents an attempt at the proverbial "do over." Appellant wishes he could "do over" his waiver of an evidentiary hearing. Appellant wishes he could "do over" his assent to the process employed by the

Bankruptcy Court. He wishes he could "do over" the confirmation process so that the Reorganized Debtors could not explicitly reserve their defenses to his claims. He wishes he could "do over" his presentation of evidence, having submitted literally hundreds of pages of irrelevant documents. And he wishes he could "do over" the fact that he failed to allege facts relevant to his equitable theories. Appellant never fully explains how and why the Bankruptcy Court erred. Rather, Appellant simply recasts his post-Hearing brief as an appellate brief and complains that the Bankruptcy Court did not view the evidence and the law his way. As discussed below, that is simply not a basis for appeal.

## I.    Appellant Waived His Right to an Evidentiary Hearing

When a party is "demonstrably 'content to rest' on the affidavits submitted to the court," it waives its right to an evidentiary hearing. *Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 748 (2d Cir. 1987); *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("a party who chooses to gamble on [the battle of affidavits] cannot be heard to complain when the decision is adverse").

*Baxter Healthcare Corp. v. Medical Laboratory Automation, Inc.*, 1994 U.S. Dist. Lexis 17651 (N.D. Ill. 1994) is instructive.[10] In that case, at a scheduling hearing with respect to Baxter's motion for preliminary injunction, the court noted that "'this might be the kind of case where written submissions are more efficient than oral submissions' and suggested that the evidence be presented in 'affidavit form and exhibits.'" *Id.* at *4-5 (transcript citation omitted). The court further noted that "'given the nature of the [evidence to be presented], it would be more helpful to me to have it in writing. I think it would make a better record, and it would save

---

[10] Pursuant to D. Del. LR 7.1.3(7), a copy of *Baxter Healthcare Corp.* is annexed hereto as Exhibit C.

court time.'" *Id.* at \*5 (transcript citation omitted). Baxter did not object to this format and thereafter submitted affidavits and exhibits and "vigorously participated in oral argument." *Id.* Furthermore, "Baxter did not request an evidentiary hearing or suggest that an evidentiary hearing was needed or would be preferable." *Id.*

After the court denied Baxter's motion, Baxter moved for an evidentiary hearing (coupled with a motion to alter judgment), arguing that an evidentiary hearing was necessary to its case. The court denied Baxter's post-ruling request for an evidentiary hearing finding, in part, that by waiting until after the court ruled adversely to it and manifesting its assent to the process by fully participating in it, Baxter waived its right to an evidentiary hearing. *Id., at \*5-6 citing Drywall Tapers & Pointers Local 1974 v. Local 530*, 954 F.2d 69, 77 (2d Cir. 1992); *Panther Systems II, Ltd. v. Panther Computer Systems, Inc.*, 783 F. Supp. 53, 63 n.5 (E.D.N.Y. 1991); *Picker Intern'l v. Kodak Caribbean, Ltd.*, 826 F. Supp. 610, 612 (D.P.R. 1993); *see also Greenberg v. Paul Revere Life Insurance Company*, 91 Fed. Appx. 539, 541 (9th Cir. 2004) ("Paul Revere waived its objection when it failed to later request an evidentiary hearing after being earlier invited to do so by the district court.").[11]

---

[11] As a memorandum decision, Rule 36-3 of the Ninth Circuit local appellate rules limits citation of this opinion in cases adjudicated in the Ninth Circuit. The Reorganized Debtors cite this decision as persuasive and/or illustrative authority.

The "after-the-fact" protestation addressed by the *Baxter* court is precisely what happened here. At the Hearing, the Bankruptcy Court indicated that it had not allotted time for an evidentiary hearing that day, but agreed to hear argument – only if the parties agreed. *See* Hearing Tr. at p. 53, ln. 15-16.[12]  The Bankruptcy Court stated:

> [T]o the extent you are requesting an evidentiary hearing I don't mind putting this over to give you an opportunity to fully present whatever evidence you have.  I don't want to short change you the opportunity if you feel that an evidentiary hearing would be the most appropriate manner in which to present the respective parties positions.

Hearing Tr., at p. 54, ln. 11-17.  To which Appellant responded "And Your Honor, my view is that we should argue it today." *Id.* at p. 54, ln. 18-19.

Following argument, the Bankruptcy Court indicated that it wished to have post-hearing briefs and instructed the parties to "consult and agree upon submission of documents that may not have been submitted with your original papers…that you wish the Court to consider in support of your respective positions." Hearing Tr., at p. 72, ln. 15-19.  Rather than object to this process, Appellant clarified that "if there's not an agreement on a certain document or a certain fact…then each party can submit their own document, is that what I understand?" Hearing Tr., at p. 73, ln. 7-8, 11-12.[13]

---

[12] Notably, at the Hearing, Appellant argued that "we believe this matter can be decided on the papers." Hearing Tr., at p. 54, ln. 1-3.  At that stage in the proceedings, the "papers" included several documents submitted to the Court with Appellant's Motion including a copy of his proof of claim, employment agreement, the complaint in Appellant's Texas state court action and an unsworn "summary" of the claims of the parties.  Thus, to have this matter "decided on the papers" as Appellant desired would have necessarily meant that the Court would consider all of Appellants' documentary evidence without the benefit of a hearing.

[13] A typographical error in the transcript attributes this quote to Mr. Barry, when, in fact, it is Mr. Sullivan, counsel to Appellant, speaking.

14

Thereafter, counsel for Appellant and the Reorganized Debtors conferred on the submission of documents. At no time did Appellant object to any of the documents to be submitted by the Reorganized Debtors. Appellant then submitted the Ferguson Post-Hearing Brief and with it filed 26 pages of case law and a 537-page appendix including 21 exhibits. In none of the nearly 600 pages of post-hearing documents is there a protestation to the procedure employed by the Bankruptcy Court for considering evidence.

What is more, the parties jointly submitted a *Certificate of Completion of Briefing* (the "Certificate of Completion") [*see* Amended Designation No. 26], wherein the parties agreed that they "underst[ood] that the Court instructed the parties to submit any and all documents relevant and supportive of the parties' respective positions. Accordingly, each party has submitted all such documents."[14] Again, there was no objection by Appellant to the procedure utilized by the Court for submitting evidence.

In sum, Appellant was given an opportunity at the beginning of the Hearing, at the conclusion of the Hearing and in his post-Hearing brief to contest the procedure utilized by the Court and request an evidentiary hearing. Instead, he actively participated in the process submitting over 500 pages of evidence (and failing to contest any evidence submitted by the Reorganized Debtors) and confirmed for the Bankruptcy Court that he, in fact, submitted "any and all documents relevant and supportive of [his] position." Having clearly manifested his

---

[14] In the Certificate of Completion, the parties included a reservation of right to contest the documents submitted to the Bankruptcy Court on any and all grounds, including admissibility. This reservation does not relate to the Motion; rather, as indicated in the parties' briefing before the Bankruptcy Court, it relates to the issue of whether Ferguson was terminated for "cause," which was deferred for subsequent litigation. Therefore, to the extent the documents submitted to the Bankruptcy Court were relevant to that issue, the parties reserved their evidentiary objections.

15

assent to the process by fully participating in it and only protesting after an adverse ruling, Appellant waived his right to an evidentiary hearing.

## II.    Assuming, *Arguendo*, that the Bankruptcy Court Erred in Not Conducting an Evidentiary Hearing, Such Error was Harmless

An erroneous evidentiary ruling is subject to harmless error review. *In re Midland Marina, Inc.*, 259 B.R. 683 (B.A.P. 8th Cir. 2001) *citing First Card v. Carolan (In re Carolan)*, 204 B.R. 980, 987 (B.A.P. 9th Cir. 1996). Pursuant to 28 U.S.C. § 2111 and FED. R. BANKR. P. 9005, an error is harmless if it does not affect a substantial right of the party. An error that is harmless is not grounds for reversal. *See* 28 U.S.C. § 2111; FED. R. CIV. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.") (incorporated by reference in FED. R. BANKR. P. 9005). When the record before the court is so substantial that there would be no benefit from an evidentiary hearing, denial of such hearing does not constitute reversible error. *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988) (detailed briefs, affidavits of six of the principal witnesses, hundreds of pages of deposition testimony, and more than two dozen documentary exhibits were sufficient to decide motion for preliminary injunction). In the instant appeal, Appellant has failed to demonstrate how a substantial right was affected. Thus, assuming, *arguendo*, that the Bankruptcy Court process (notwithstanding the assent of the parties) was erroneous, such error was harmless and therefore not a basis to reverse on appeal.

Appellant argues that the Bankruptcy Court "committed reversible error by failing to permit an evidentiary hearing on the Motion that unfairly and improperly prejudiced Ferguson's ability to present his case." Appellant's Opening Brief, at p. 11.

16

Notably, Appellant never fully illustrates how his ability to present his case was prejudiced. Instead, Appellant concedes in his opening brief that all of the factual evidence that <u>would</u> <u>have</u> <u>been</u> presented at an evidentiary hearing <u>was</u> set forth in his post-Hearing submissions. *See* Appellant's Opening Brief, at p. 11 ("The factual evidence which would have been presented at an evidentiary hearing on the Motion for Set Off, <u>and</u> <u>which</u> <u>was</u> <u>set</u> <u>forth</u> <u>in</u> Ferguson's <u>Post-Hearing</u> <u>Brief</u>...") (emphasis added). He further argues time and again in his opening brief that the evidence he submitted was "<u>uncontradicted.</u>" *See, e.g.*, Appellant's Opening Brief, at p. 11 ("Mr. Ferguson presented uncontradicted evidence..."); *id.* at p. 12 (describing "uncontradicted" evidence). Put another way, Appellant had no more compelling evidence than was submitted for consideration by the Bankruptcy Court, and therefore, no substantial right was affected by the Bankruptcy Court's process. Thus, to the extent the Bankruptcy Court committed error in not conducting an evidentiary hearing (which it offered to do, but was refused by Appellant), such error was harmless since Appellant concedes that he presented <u>all</u> of the evidence that he would have presented at an evidentiary hearing and argues on appeal that all such evidence was <u>uncontradicted</u>.

Finally, the Reorganized Debtors provided Appellant a list of documents they intended to file with the Reorganized Debtors' Post-Hearing Brief a full week prior to completion of briefing – ten documents in all. None of them had been objected to by Ferguson; five of the ten documents were submitted by Appellant to the Bankruptcy Court as well; six of them he authenticated at his deposition; two were Court-filed documents, to which the Bankruptcy Court could take judicial notice pursuant to FED. R. EVID. 201 (portions of the Plan and disclosure statement); one was Ferguson's deposition transcript and the last was Ms.

Shafer's affidavit – a witness who Appellant's counsel deposed for hours and whose affidavit was derived largely from her deposition testimony. Appellant, on the other hand, submitted some 537 pages of evidence, which the Reorganized Debtors had no opportunity to challenge, and which would have been subject to objection on numerous grounds. Thus, to the extent the Bankruptcy Court committed error, said error was harmless as to Appellant.

## III.    The Bankruptcy Court Correctly Construed Setoff Narrowly

The Third Circuit Court of Appeals has held that "setoff is at odds with a fundamental policy of bankruptcy, equality among creditors, because it 'permits a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor…" *In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) *quoting In re Braniff Airways, Inc.*, 42 B.R. 443, 448 (Bankr. N.D. Tex. 1984); *see also In re Bram*, 179 B.R. 824 (Bankr. S.D. Tex. 1995)("Setoff is allowed only in very narrow circumstances in bankruptcy."). The equitable right of setoff "cannot be invoked in a case where the general principles of setoff would not justify it." *In re Bevill,* 896 F.2d at 57. One such general principle is that "[t]he mutuality requirement of section 553 of the Bankruptcy Code is strictly construed." *In re Art Metals U.S.A., Inc.*, 109 B.R. 74, 78 (Bankr. D. N.J. 1989) (emphasis added); *In re Virginia Block Company*, 16 B.R. 560, 562 (Bankr. W.D. Va. 1981) (same); *In re Lang Machinery Corp.*, 1988 Bankr. LEXIS 1667, *13 ("[S]trict construction of section 553 is required…").[15]

---

[15] Pursuant to D. Del. LR 7.1.3 (7),  a copy of *Lang Machinery* is annexed hereto as Exhibit D.

Thus, the Bankruptcy Court correctly started from the presumption that "[f]or setoff purposes, the mutuality requirement is strictly construed." *In re Garden Ridge Corporation*, 338 B.R. at 634 (citations omitted).

## IV. The Bankruptcy Court Correctly Concluded that Substantive Consolidation Had No Effect on the Reorganized Debtors' Defense to Ferguson's Setoff Claim

### A. The Bankruptcy Court Correctly Concluded that the Reorganized Debtors' Plan Expressly Preserved All Defenses to Appellant's Setoff Claim Notwithstanding Substantive Consolidation of their Estates

Appellant argues that the Confirmation Order "conclusively established the requisite mutuality...regardless of whether they were originally obligations of separate Debtors." Opening Brief, at p. 15. On this point, Appellant and the Reorganized Debtors agree that "[t]he language of the Plan and Confirmation Order controls on the issue of mutuality and cannot be disregarded by the Bankruptcy Court[]" – but not in the manner suggested by Appellant.

Article VIII(F) of the Reorganized Debtors' confirmed Plan states, in part:

> Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any...legal or equitable defense that the Debtors had immediately prior to the Petition Date...The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such...legal or equitable defenses that the Debtors had immediately prior to the Petition Date <u>as fully as if the Chapter 11 Cases had not been commenced</u>...

Plan, at Art. VIII(F), at p. 36 (emphasis added), the relevant pages of which are annexed as Exhibit 9 to the Debtors' Post-Hearing Brief; *see also* Amended Designation No. 11. An identical provision can be found in Article VIII(I)(6) of the *Disclosure Statement for the*

*Debtors' Joint Plan of Reorganization Under Chapter 11 of the Plan* (the "Disclosure

Statement"), the relevant pages of which are annexed as Exhibit 10 to the Debtors' Post-Hearing

Brief; *see also* Amended Designation No. 12.[16]

Because the Plan explicitly reserved the Reorganized Debtors' right to assert <u>any</u>

defense available to them as if these chapter 11 bankruptcy cases had <u>never</u> <u>been</u> <u>commenced</u>,

the Bankruptcy Court correctly concluded that substantive consolidation of the Debtors' chapter

11 estates had no impact, whatsoever, on the Reorganized Debtors' defense to Ferguson's setoff

claim. The fact that Appellant, in his opening brief, utterly failed to address the Plan's clear

reservation of the Reorganized Debtors' defenses to his claim notwithstanding substantive

consolidation is telling.

> **B.    The Bankruptcy Court Correctly Concluded
> that Substantive Consolidation Cannot Create
> <u>Mutuality Where it Did Not Otherwise Exist</u>**

With respect to the effect of substantive consolidation on defenses to a claim that

existed prior to the estates being substantively consolidated – such as lack of mutuality – the

Bankruptcy Court correctly relied on *In re Murray Industries, Inc.*, 125 B.R. 314, 317 (Bankr.

M.D. Fla. 1991).

In *In re Murray Industries, Inc.*, the United States Bankruptcy Court for the

Middle District of Florida held that "substantive consolidation of several estates means one thing

and one thing only – that all assets of the several entities are pooled and all creditors of the

several entities are entitled to share in the pooled assets in accord with their respective rights. It

---

[16] Ferguson was served with the Disclosure Statement, Plan and notice of entry of the Confirmation Order, but did not object to approval of the Disclosure Statement or confirmation of the Plan.

would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation." *In re Murray Industries, Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991). Thus, coupled with the Plan's preservation language discussed above, substantive consolidation in these cases could not have destroyed the Reorganized Debtors' defense to Appellant's setoff claim since, to do so, would offend equity and fairness. As the Bankruptcy Court stated, the Reorganized Debtors' estates were not substantively consolidated so "Ferguson could enjoy the benefits of setoff." *In re Garden Ridge Corporation*, 338 B.R. at 641.

Judge Baxter's decision in this regard is entirely in accord with the most recent case law on the subject of setoff. In *In re Delta Airlines, Inc.*, 341 B.R. 439 (Bankr. S.D.N.Y. March 23, 2006) – a decision issued after this appeal was filed – Judge Adlai Harden addressed the issue of whether a former landlord can set off pre-petition claims the debtor held against it with lease rejection damages claims it held against the debtor. *See id.* at 441-442. The Court focused on the plain language of the Bankruptcy Code's setoff provision – section 553— which states that "this title does not affect any right of a creditor to offset a mutual debt…" 11 U.S.C. § 553.

The Court – applying the plain language of Section 553 – held that "Section 553 does not <u>create</u> a federal right of setoff, nor does it <u>enhance</u>, <u>diminish</u> or <u>otherwise</u> <u>modify</u> any state law right of setoff" and went on to state that, "if no right of setoff under state law existed before commencement of the case, none exists under Section 553." *In re Delta Air Lines Inc.*, 341 B.R. at 443, 445. Since rejection damages claims arise only <u>during</u> and <u>as a result of</u> the

21

bankruptcy and not before, they are, therefore, not pre-petitions claims subject to setoff.  In this regard, the Court stated:

> The reason is simple. The rejection damage claim is not "a claim . . . against the debtor that <u>arose</u> before the commencement of the case" as a matter of state law.  The rejection claim did not "arise" pre-petition in any sense of the word.  It did not exist pre-petition either as an actual claim or as a contingent claim, any more than the possibility of some future breach of contract claim can be said to "arise" or exist before the actual breach.  Thus, as a matter of temporal fact and as a matter of state law, <u>there was no claim of GOAA against Delta that "arose" pre-petition</u> to be offset against Delta's putative or supposed pre-petition claim against GOAA based on the Credits. Since the cases uniformly recognize that the Bankruptcy Code does not create a right of setoff, and that the only right of setoff preserved under Section 553 is a right that existed under non-bankruptcy state law before the bankruptcy filing, GOAA's claimed setoff must fail.

*Id.* at 446 (emphasis in original).

This analysis directly supports Judge Baxter's conclusion that substantive consolidation cannot retroactively create mutuality for setoff purposes.  *See In re Garden Ridge Corporation*, 338 B.R. at 641.  Ferguson had no pre-petition claim against Garden Ridge, L.P. He argues, however, that that substantive consolidation – a concept that is unique to bankruptcy – turned his pre-petition claim against Garden Ridge Management, Inc. into a claim against Garden Ridge, L.P.  Thus, Ferguson's claim did not "arise" against Garden Ridge Management, Inc. pre-petition, but (according to him) only <u>after</u> the estates were substantively consolidated.  As noted in *Delta*, bankruptcy cannot create the conditions for setoff if they did not exist prior to bankruptcy.  Therefore, Judge Baxter correctly concluded that substantive consolidation had no impact on Ferguson's setoff claims.

Furthermore, not only does the case relied upon by Appellant — *In re Cooper*, 147 B.R. 678 (Bankr. D. N.J. 1992) – not support Appellant, it supports the Reorganized Debtors. In *Cooper*, two individuals – the Coopers – formed two corporations that held title to the Coopers' business operations known as Oyster Bay Restaurant. *See id.* at 680. The Coopers filed for protection under Chapter 11 of the Bankruptcy Code. *See id.* Following his appointment, the trustee in bankruptcy moved to extend the Coopers' case to include the two corporate entities and the Court (on the trustee's motion) substantively consolidated the three estates on the theory that that the two corporations were alter egos of the Coopers individually. *See id.* The trustee also converted the cases to cases under Chapter 7 of the Bankruptcy Code. *See id.*

The Internal Revenue Service (the "IRS"), asserted a secured claim against the Coopers and, following substantive consolidation, against the consolidated estates of all debtors. *See id.* at 681. The trustee argued that the extension of the IRS's tax lien against the Coopers to the consolidated estates violated the automatic stay provided to debtors under section 362(a) of the Bankruptcy Code. *See id.*

The *Cooper* Court started from the premise that "[w]here substantive consolidation is warranted, it does not necessarily have to be unlimited...The court can consolidate estates as to unsecured claims without consolidating as to secured claims; a secured creditor with a consensual lien is only entitled to such collateral as it bargained for." *Id.* at 682. The Court in *Cooper* went on to state that, "[w]here, however, substantive consolidation is unlimited, it has been held that the involuntary tax lien of the United States is extended to all assets of the consolidated estates." *Id.* The Court also noted that modification of an order of

23

substantive consolidation may be appropriate where substantive consolidation would result in a windfall to a secured creditor. *See id.* Finally, in denying the trustee's motion, the Court was persuaded by the fact that the basis for substantive consolidation was the trustee's prior argument that the debtors were alter egos of one another and that the corporate form was a result of "subterfuge" and entered into in order to "subvert New Jersey law". *Id.* at 682-683.

The Reorganized Debtors do not suggest that substantive consolidation was limited to unsecured claims only. However, substantive consolidation was, in fact, limited by the reservation of defenses discussed in section IV.A, *supra.* Without belaboring the point, the Reorganized Debtors clearly and unequivocally reserved the right to any defense available to it had their bankruptcy cases not been commenced. Hence, as *Cooper* recognizes, substantive consolidation can be limited and, indeed, in this case was limited. Further, if substantive consolidation were to "create" mutuality as to Appellant's claim where it did not otherwise exist, it would clearly result in a windfall to Appellant, whose claim against the Reorganized Debtors is otherwise unsecured. As the *Cooper* Court noted, such an inequitable result is grounds to limit the application of substantive consolidation. As Judge Baxter noted, the Debtors' estates were not consolidated so he could "enjoy the benefits of setoff." *In re Garden Ridge Corporation,* 338 B.R. at 641. Finally, the Reorganized Debtors did not argue an "alter ego" theory in order to obtain substantive consolidation. And, not only did the Bankruptcy Court rule that the "alter ego" theory was not proven by Appellant, it specifically ruled that Appellant did not even allege necessary elements of the "alter ego" doctrine. *See id.* at 639. ("To the extent that Ferguson argues that GRM is the 'alter ego' of GRLP, Ferguson has not alleged that the Debtors

maintained GRM and GRLP as separate entities for fraudulent purposes. Under Texas law, the alter ego doctrine requires a showing of fraud.").[17]

In sum, Ferguson would have this Court elevate his otherwise general unsecured claim to secured status merely by virtue of substantive consolidation. Nothing in the Plan or the Confirmation Order (or Bankruptcy Code, for that matter) affords Ferguson any treatment other than that of a non-priority, general unsecured creditor. Such a result would, in the words of the *Murray Industries* Court, destroy defenses and rights which existed prior to substantive consolidation and, as recognized by the *Cooper* Court, would create a windfall to Ferguson, in violation of the due process of among others, the Reorganized Debtors and the other unsecured creditors of the Debtors' estates. Such a result is both unintended and untenable and should not be sanctioned by this Court.

## V.    The Bankruptcy Court Properly Considered All Evidence and Correctly Concluded that the Facts Do Not Support Appellant's Claim to Setoff

In *Anderson v. Bessemer City, N.C.*, the Supreme Court stated:

> Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles… is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under

---

[17] Appellant's citation to *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) for the proposition that substantive consolidation "automatically created the mutuality required for set off" is equally misplaced. Appellant's Opening Brief, at 17. *Owens Corning* addresses the general purpose behind and requirements for substantive consolidation. Neither *Owens Corning* nor *Cooper* dealt with a debtor's express reservation of defenses as if the bankruptcy case had never occurred notwithstanding substantive consolidation.

25

Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969). <u>If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.</u> Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949) (citation omitted). This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (emphasis added); *see also Lansford-Coaldale Joint Water Authority v. Tonolli Corporation*, 4 F.3d 1209, 1216 (3d Cir. 1993) ("[I]t is well-established that 'where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'") *quoting Anderson*, 470 U.S. at 574.

Here, assuming Appellant's view of the evidence is plausible, there were two permissible views of the evidence – that Appellant was employed by Garden Ridge Management, Inc. or that he was employed by some amorphous entity encompassing all of the Garden Ridge entities unknown to Appellant. As is evident from the detailed discussion in the Order, the Bankruptcy Court carefully scrutinized all of the evidence and particularly identified most, if not all, of the evidence submitted by Appellant. However, after that careful review, the Bankruptcy Court simply did not view Appellant's evidence as persuasive.

26

The totality of the facts support one conclusion — the conclusion reached by the Bankruptcy Court: Ferguson was an employee of Garden Ridge Management, Inc., the Notes were issued in favor of Garden Ridge L.P. and as such, no mutuality exists. Such a conclusion is amply supported by record, including the following underlined undisputed facts:

- Garden Ridge Management, Inc. and Garden Ridge, L.P. are separate legal entities. *See* Hearing Tr., at p. 59, ln. 13-15 ("THE COURT: Mr. Sullivan, is Garden Ridge Management as well as Garden Ridge, L.P., are they separate legal entities? MR. SULLIVAN: Yes, they are, Your Honor.").

- Mr. Ferguson was paid by Garden Ridge Management, Inc. *See* Exhibit 3 to Debtors' Post-Hearing Brief; Ferguson Tr., at p. 26, ln. 11-14, 18-20 ("Q: Do you have any reason to dispute that this is an accurate copy of your pay stub for that period? A: No, I don't….Q: Do you recall ever receiving a paycheck that looked any different from this in form? A: No.").

- Mr. Ferguson's W-2's listed him as an employee of Garden Ridge Management, Inc. *See* Exhibit 4 to Debtors' Post-Hearing Brief; Ferguson Tr., at p. 28 ln. 15-18, 24, p. 28, ln. 1-2 ("Q: And in the box labeled 'G, employer's name, address and zip code,' what's the entity that's named there? A: Garden Ridge Management, Inc….Q: Is this the W-2 form that you used to fill out [your] personal income tax return? A: I believe it is.")

- Garden Ridge, L.P. has no employees. *See* Shafer Aff., at ¶ 8.

- Garden Ridge, L.P. pays no one a salary. *See id.*

- Garden Ridge, L.P. pays no one benefits, including severance. *See id.*

- The Notes are payable to Garden Ridge, L.P. *See* Appellant's Opening Brief, at p. 9, ¶ 8 ("The parties agree that Mr. Ferguson received a loan…secured by a note…payable to Debtor Garden Ridge, L.P….")

Simply put, the evidence clearly shows that Ferguson was employed by Garden Ridge Management, Inc., notwithstanding Ferguson's alleged subjective belief to the contrary.

27

Ferguson's claim that he did not know he was employed by Garden Ridge Management, Inc. seems questionable given the facts of his employment. Ferguson was a high-level executive who sat on an Executive Committee, reported directly to the president and made recommendations to the board of directors. Ferguson never received a paycheck from anyone other than Garden Ridge Management, Inc., nor did his W-2s list anyone other than Garden Ridge Management, Inc. as his employer. He claims to have had responsibility over complex matters such as capital expenditures, real estate acquisition and financial reporting (*see* Ferguson Tr., at p. 12, ln. 16-20 and p. 65, ln. 14-20), all of which would have required a detailed knowledge of the Debtors' corporate structure. At best, Ferguson's claim of ignorance is questionable; at worst, it is dubious.

Appellant argues that "Garden Ridge, L.P.'s Statement of Financial Affairs...shows that Garden Ridge, L.P. was the Debtor responsible for severance pay..." and then goes on to note that "Exhibit 3-2 discloses payments...made to Ferguson in 2003, eliminating any questions that all payments to Ferguson did not go through GRM." Appellant's Opening Brief, at p. 20. What Appellant ignores (and the Bankruptcy Court likely did not), is that the Statement of Financial Affairs for Garden Ridge, L.P. clearly states – in bold – that current and former officers of Garden Ridge, L.P. are "**employed by and paid by Garden Ridge Management, Inc.**" *See* Ferguson Appendix, Exhibit 12, p. A281. Furthermore, the Statement of Financial Affairs for Garden Ridge Management, Inc. lists as its source of income the management fee paid by Garden Ridge, L.P. for its use of Garden Ridge Management, Inc.'s employees. *See id.* at Exhibit 13, p. A368.

28

Appellant dedicates an entire page in his opening brief to arguing that the payroll account that funded and disbursed all payroll checks was owned by Garden Ridge, L.P. as set forth in one of the Debtors' "first day" motions filed in February 2004. However, as Appellant notes on page 21 of his opening brief, this fact was clarified by Ms. Shafer in her deposition testimony; she confirmed that the payroll account is owned and controlled by Garden Ridge Management, Inc. In fact, Ms. Shafer testified in no less than six ways in her deposition that Garden Ridge Management employs all Garden Ridge employees.[18] What is more, it is undisputed that Ferguson's paychecks were all issued from Garden Ridge Management, Inc. and his W-2 forms all listed Garden Ridge Management, Inc. as his employer, thus completely undermining Appellant's argument that his employer's identity was unclear.[19]

Appellant further argues that the Bankruptcy Court "ignored the plain language of the Loan Agreement that made clear the parties' understanding that Ferguson was receiving a loan from GRLP as one of that entity's employees." Opening Brief, at p. 14. The "Loan Agreement" referred to defines "the Company" as Garden Ridge, L.P. and states, in describing Appellant, that "You are currently serving as an employee of the Company." Ferguson Appendix, Exhibit 2. Appellant characterizes this statement as an "uncontradicted, contemporaneous written admission by GRLP that it made the Loan…as Ferguson's employer"

---

[18] *See, e.g.,* Ferguson Appendix, at pp. A498 (p. 34) ln. 16-19; (p. 35) ln. 14-20; A499 (p. 38) ln. 15-22; A504 (p. 58) ln. 9-17; A509 (p. 81) ln. 9-11; A510 (p. 82) ln. 8-14.

[19] Although at his deposition Ferguson authenticated a paycheck and W-2 naming Garden Ridge Management, Inc. as his employer, verified that he used the W-2 to complete his federal tax return for 2003 and confirmed he had only one employer in 2003, he claims to have simply listed "Garden Ridge" as his employer on his 2003 federal tax return.

29

and argues that "[t]he Bankruptcy Court's complete failure to acknowledge this admission was a clear error of fact that compels reversal." Opening Brief, at pp. 12-14.

The Loan Agreement is uncontradicted only because it was submitted with the Ferguson Post-Hearing Brief and the Reorganized Debtors did not have an opportunity to object to it. Had the Reorganized Debtors been permitted to present evidence regarding the Letter Agreement, it would have presented evidence that the party signing the Letter Agreement – Jane Arbuthnot – did not have authority to do so from the board of directors and that the board of directors had no knowledge of the loan's existence at the time.

Furthermore, the Bankruptcy Court did not ignore the language in the Letter Agreement. To the contrary, it addressed the language head-on and, in fact, quoted the language directly from Appellants' post-Hearing submissions. *See In re Garden Ridge Corporation*, 338 B.R. at 635. The Bankruptcy Court simply did not find the Letter Agreement persuasive enough to overcome all of the other evidence unequivocally indicating that Appellant was employed by Garden Ridge Management, Inc. In this regard, the Bankruptcy Court characterized Appellant's reliance on the Letter Agreement as "misguided". *See id.* at p. 635.[20]

---

[20] As the Bankruptcy Court correctly noted, the parties agreed that Garden Ridge Management, Inc. and Garden Ridge, L.P. are separate legal entities. *See* Hearing Tr. at p. 59, ln. 13-15 ("THE COURT: Mr. Sullivan, is Garden Ridge Management as well as Garden Ridge, L.P., are they separate legal entities? MR. SULLIVAN: Yes, they are, Your Honor."). Neither in his post-Hearing submission nor in his opening brief has Appellant cited any case for the proposition that his subjective belief about by whom he was employed can "create" mutuality. Therefore, the Bankruptcy Court's conclusion was correct that "Ferguson's subjective belief, however well founded, does not overcome the legal conclusion that the debts are not mutual." *See In re Garden Ridge Corporation*, 338 B.R. at 635.

Given that the totality of the facts – all of which were considered by the Bankruptcy Court – support the conclusion that Garden Ridge Management, Inc. was a separate and distinct entity that employed Mr. Ferguson, the Bankruptcy Court correctly concluded that mutuality is lacking for setoff purposes.

## VI.    The Court Correctly Concluded that Equitable Doctrines Were Not Sufficiently Alleged or Supported by Evidence

Appellant argues that the Bankruptcy Court "erred in holding that GRM and GRLP were not operated as a single entity under the 'single business enterprise doctrine'...and did not disregard the corporate form, for purposes of setoff." Opening Brief, at pp. 17-18. Although Appellant does not provide this Court with the applicable standards for applying these doctrines or any discussion of their applicability, they are – as noted by the Bankruptcy Court – not even sufficiently alleged much less proven.

Applying Texas law, the Bankruptcy Court correctly concluded that the "disregard for corporate form," "single business enterprise" and "alter ego" doctrines require some allegation of fraud, deceit, illegality, subterfuge or misuse in forming or maintaining a corporate form. *See In re Garden Ridge Corporation*, 338 B.R. at 637-640 (collecting cases).[21] Indeed, the Bankruptcy Court recognized that Appellant presented "persuasive evidence to show that the Debtors' operations overlapped substantially" and "evidence of the close relationship between GRM and GRLP..." *See id.* at 638, 640. However, with regard to disregarding the corporate form, the Bankruptcy Court correctly concluded that, under Texas law, Appellant must have shown that the Debtors misused the corporate privilege or that it would be necessary to

---

[21] The Bankruptcy Court's analysis of Texas law on these equitable doctrines is set out at length in the Order replete with nearly two dozen case citations. As such, the Bankruptcy Court analysis is not repeated herein.

31

avoid an inequitable result. *See id.* at 637-638. Here, however, there was no allegation or proof

that the Debtors misused the corporate form or that inequity would result.

With respect to the "alter ego" doctrine, the Bankruptcy Court, again applying

Texas law, correctly concluded that Appellant was required to establish that the Debtors

maintained Garden Ridge, L.P. and Garden Ridge Management, Inc. as separate entities for

fraudulent purposes. *See id.* at 639 ("Under Texas law, the alter ego doctrine requires a showing

of fraud."). Ferguson alleged no fraud before the Bankruptcy Court. Therefore, the Bankruptcy

Court correctly concluded that Ferguson failed to meet his burden.

With respect to the "single enterprise doctrine," the Bankruptcy Court found no

case law to support its application in a setoff context under Texas law, and Appellant's failure to

cite a single case for the proposition in any document, including his Opening Brief in this appeal,

speaks volumes. *See id.* at 640.

## VII. The Reorganized Debtors are Not Judicially Estopped from Defending Against Appellant's Claim

A party is judicially estopped from making an argument if it is (1) irreconcilably

inconsistent with that asserted in a prior proceeding; (2) the inconsistent position culpably

threatens the court's integrity or is intended to play fast and loose with the court; and (3) judicial

estoppel would address the affront to the court's integrity. *See Montrose Medical Group*

*Participating Savings Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001); *Coast Automotive*

*Group, Ltd. v. VW Credit, Inc.*, 34 Fed. Appx. 818, 823 (3d Cir. 2002)(same). Appellant's

unfounded claims of bad faith notwithstanding, judicial estoppel is simply not applicable on the instant facts.[22]

The parties do not dispute that Garden Ridge Management, Inc. and Garden Ridge, L.P. are separate legal entities. *See* Hearing Tr. at p. 59, ln. 13-15 ("THE COURT: Mr. Sullivan, is Garden Ridge Management as well as Garden Ridge, L.P., are they separate legal entities? MR. SULLIVAN: Yes, they are, Your Honor."). The Reorganized Debtors' position that all employees were employed by Garden Ridge Management, Inc. is not irreconcilably inconsistent with the bases for substantively consolidating their estates – especially since the Reorganized Debtors reserved their defense to Appellant's claim notwithstanding substantive consolidation. The Reorganized Debtors have maintained at all times that all employees – including Ferguson – were employed by Garden Ridge Management, Inc. As detailed above, the Statement of Financial Affairs for Garden Ridge, L.P. and Garden Ridge Management, Inc. and the Schedules of Assets and Liabilities for Garden Ridge Management, Inc. all clearly state that all employees are employed and paid by Garden Ridge Management, Inc. The Reorganized Debtors produced evidence – paychecks and a W-2 — indicating that Appellant was paid only by Garden Ridge Management, Inc. Ms. Shafer's deposition testimony supports this position and her affidavit makes clear Garden Ridge, L.P. has no employees of its own. Finally on this point, the Reorganized Debtors' confirmation brief states, in discussing substantive consolidation, that "all of the Debtors' employees are employed by GR Management..." and that Garden Ridge Management has "significant operations and/or material value..." Amended

---

[22] Appellant's arguments that the Reorganized Debtors have acted in bad faith and have taken "deliberately inconsistent positions before the Bankruptcy Court" are completely unsupported by any evidence. Appellant's Opening Brief, at p. 26.

Designation No. 13 at pp. 40-41, ¶¶ 96-97; Ferguson Appendix, Exhibit 16.[23] Thus, throughout these proceedings and, indeed, on the eve of substantive consolidation and confirmation, the Reorganized Debtors' position was and continues to be consistent and in complete accord with their current position.

## VIII.  The Bankruptcy Court Correctly Concluded That No Permissible Triangular Setoff Exists

The law on "triangular" setoff is set forth in *In re Virginia Block Company*, 16 B.R. 560 (Bankr. W.D. Va. 1981). In *Virginia Block*, the proponent of setoff, Bushong, owned two separate companies, Bushong Realty and Pulaski Motor Co., Inc. *See id.* at 561. Over the years, Bushong and the debtor "developed a practice of offsetting mutual accounts receivable." *Id.* "The parties had no specific agreement to conduct business in this manner, the procedure simply grew out of the friendship of the parties." *Id.*

Following the debtor's bankruptcy filing, Bushong proposed to continue the pre-petition practice of setting off amounts collectively due from the debtor to Bushong Realty and Pulaski Motor Co., Inc. with amounts owed to the debtor from Bushong's two companies. *See id.* The court held that this is impermissible since the element of mutuality was lacking. *See id.* at 562.

The *Virginia Block* Court began from the well-settled premise that "[s]trict construction of the element of mutuality means that a debt due to an individual partner cannot be setoff against a claim of the partnership." *Id.* (citation omitted). This is precisely what Ferguson

---

[23] The confirmation brief was filed only two weeks after the Motion, thus providing Appellant with ample time to clarify the record on this fact.

is attempting to do – set off his claim against a partner (Garden Ridge Management, Inc.) with a debt owed to the partnership (Garden Ridge, L.P.).

Given the strict construction afforded to the mutuality requirement, the Court found that the parties' informal conduct of treating Bushong Realty and Pulaski Motor Co., Inc. as a single entity for purposes of reconciling accounts did not transform their separate identities into a single until for purposes of setoff. *See id.* Absent a <u>formal agreement</u> by all parties to treat the two entities as one, the Court held that setoff was impermissible. *See id.*[24]

Here, the Bankruptcy Court correctly noted that there was no formal agreement by Garden Ridge Management, Inc. and Garden Ridge, L.P. to be treated as a single entity for purposes of the claim against and by Ferguson.[25]  Thus, because there is no evidence of a formal agreement that Garden Ridge Management, Inc. and Garden Ridge, L.P. agreed to be treated as a single entity for purposes of claims by and against Ferguson, the Bankruptcy Court correctly concluded that no permissible triangular setoff exists.

---

[24] The Reorganized Debtors' position on this point is supported by both cases cited by Ferguson. *See* Appellant's Opening Brief, at 14, ln. 4 *citing In re Lang Machinery Corporation*, 1988 Bankr. LEXIS 1667, *13 (Bankr. W.D. Pa. 1988)(evidence of an oral agreement between the parties, without evidence of a formal agreement, is insufficient to support allegation that the parties agreed to treat two entities as one for purposes of setoff); *Depositors Trust Co. v. Frati Enterprises, Inc.*, 590 F.2d 377, 379 (1st Cir. 1979)(offset of debt owed by debtor to noteholder with funds held by noteholder's "sister banking corporation" who provided debtor's inventory financing prohibited under Bankruptcy Act even though two creditors are "basically the same bank").

[25] Indeed, the evidence demonstrates the contrary.  For example, the Notes are clearly only from Garden Ridge, L.P. – a point which Ferguson has conceded.  Had Garden Ridge Management, Inc. and Garden Ridge, L.P. agreed to be treated as one for purposes of the Notes, surely Garden Ridge Management, Inc. would be named as a co-payee on the Notes.

062883.1001

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the decision of the Bankruptcy

Court should be affirmed.

Dated:  July 20, 2006
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
Sean T. Greecher (No. 4484)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Justin G. Brass
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Co-counsel to the Reorganized Debtors

DB01:2140151.8                                                    062883.1001

# Exhibit A

LEXSEE 2005 US DIST LEXIS 9559

**In re: VIDEO UPDATE, INC., et al. Debtors. PALMS ASSOCIATES, Appellant, v. VIDEO UPDATE, INC., et al. Appellees.**

**Civil Action No. 03-18 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 9559*

**May 19, 2005, Decided**

**PRIOR HISTORY:** [*1] Chapter 11. Bankruptcy Case No. 00-3663 (JHW) (Jointly Administered). Adversary Proceeding No. 02-276.

**COUNSEL:** For Video Update Inc., D-Skippy Inc., GBO Inc., PTO Inc., Tinseltown Inc., Moovies Inc. of the Carolinas Inc., Pic-A-Flick of Greenville Inc., Moovies of Georgia Inc., Movie Store Inc. #2, Movie Store III, Alpharetta Media Associates Inc., Rio Media Associates Inc., Moovies of Iowa Inc., Moovies of Michigan Inc., Movie Warehouse Franchise Systems Inc., E.C.6. Inc., DCO Inc., Soni Inc., Sno Inc., PQ3 Inc., Debtors: William K. Harrington, Duane Morris LLP, Wilmington, DE.

For Palms Associates, Appellant: Michelle McMahon, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For Video Update Inc., D-Skippy Inc., GBO Inc., PTO Inc., Tinseltown Inc., Moovies Inc. of the Carolinas Inc., Pic-A-Flick of Greenville Inc., Moovies of Georgia Inc., Movie Store Inc. #2, Movie Store III, Alpharetta Media Associates Inc., Rio Media Associates Inc., Moovies of Iowa Inc., Moovies of Michigan Inc., Movie Warehouse Franchise Systems Inc., E.C.6. Inc., DCO Inc., Soni Inc., Sno Inc., PQ3 Inc., Appellees: William K. Harrington, Duane Morris LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES [*2] DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**ORDER**

1. On January 9, 2003, Palms Associates ("Palms") filed an appeal from the November 25, 2002 Order of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), which authorized Video Update, Inc., et al.'s (the "debtors") assumption of a ground lease between Palms and the debtors, and overruled Palms' objection to confirmation of the debtors' Plan of Reorganization (the "Plan").

2. The facts of this action are set forth in the Bankruptcy Court's October 4, 2002 unpublished opinion, *In re Video Update, Inc., et al.,* Case Nos. 00-3663 through 00-3683 (JHW) (D.I. 1789.)

3. The court has jurisdiction to hear this appeal pursuant to *28 U.S.C. § 158(a) (2004).* In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous. *See Mellon Bank, N.A. v. Metro Comm., Inc., 945 F.2d 635, 641 (3d Cir. 1991), cert. denied, 503 U.S. 937, 117 L. Ed. 2d 620, 112 S. Ct. 1476 (1992).* Conversely, a Bankruptcy Court's conclusions of law are subject to plenary review. *See id.* Mixed questions of law and fact [*3] are subject to a "mixed standard of review." *See id. at 641-42.* Under this "mixed standard of review," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts." *Id.*

4. After reviewing the opinion of the Bankruptcy Court under a plenary standard of review, n1 the court concludes that the Bankruptcy Court correctly determined that the lease between the parties did not terminate prepetition (*i.e.* it remained executory on the date that the debtors filed for bankruptcy) and could properly be assumed by the debtors pursuant to *11 U.S.C. § 365(a).*

n1 The parties filed a stipulation with the Bankruptcy Court on January 30, 2002, in which they stipulated to the basic facts of this matter.

a. First, the court agrees with and adopts the Bankruptcy Court's analysis and **[*4]** conclusion that because the October 5, 1999 letter from Palms to the debtors contained defects it did not effectively serve to terminate the lease between the parties.

b. The court also adopts the analysis and conclusion reached by the Bankruptcy Court regarding the Virginia District Court judgment, dated October 29, 1999, namely, that the Bankruptcy Court had to examine whether the lease terminated pre-petition without resort to the District Court judgment. *See Ragan v. Woodcroft Village Apartments, 255 Va. 322, 497 S.E. 2d 740, 742 (Va. 1998)* ("The purpose of this two-tier trial system is to allow a party aggrieved by a final judgment of the general district court to have the case tried again by the circuit court as if the case originally had been instituted there. Such an appeal is in effect a statutory grant of a new trial, in which the perfected appeal annuls the judgment of the district court as completely as if there had been no previous trial.")

c. In addition, the court adopts the Bankruptcy Court's rationale and conclusion that the Allen Mechanics Lien was not the basis for Palms' purported termination of the lease. *SeeGE Capital Corp. v. Video Update, Inc. (In re Video Update, Inc.), 2002 U.S. Dist. LEXIS 13996, Case Nos. 00-3663 through 00-3683 (JHW), at 6-7* (according to the parties' stipulation, Palms notified the debtors that the lease was terminated due to only non-payment of September 1999 and October 1999 rents).

5. Lastly, because the court has concluded that the Bankruptcy Court correctly determined the lease could be assumed by the debtors, it concludes that the Bankruptcy Court properly overruled Palms' objection to the Plan.

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The November 25, 2002 Order of the Bankruptcy Court is AFFIRMED.

Dated: May 19, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# **Exhibit B**

LEXSEE 338 BR 634

In Re: GARDEN RIDGE CORPORATION, et al., Debtors.

In Proceedings Under Chapter 11, Case No.: 04-10324

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

*338 B.R. 627; 2006 Bankr. LEXIS 373*

February 10, 2006, Decided

**COUNSEL:** [**1] For Garden Ridge Corporation, Debtor: Erin Edwards, Joseph M. Barry, Pauline K. Morgan, Sean T. Greecher, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Russell Mentlewski, Petitioning Creditor: Barbara H. Stratton, Knepper & Stratton, Wilmington, DE.

For United States Trustee, U.S. Trustee: David Michael Klauder, US Trustee's Office, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: David M. Fournier, David B. Stratton, Evelyn J. Meltzer, James C. Carignan, Pepper Hamilton LLP, Wilmington, DE.

For Concord MillsMall Limited Partnership, Creditor Committee: Christina Maycen Thompson, Connolly Bove Lodge & Hutz LLP, Wilmington, DE.

**JUDGES:** Randolph Baxter, UNITED STATES BANKRUPTCY JUDGE.

**OPINIONBY:** Randolph Baxter

**OPINION:**

[*630] **MEMORANDUM OF OPINION AND ORDER**

JUDGE RANDOLPH BAXTER

Before the Court is the motion of Daniel Ferguson ("Ferguson") for relief from the automatic stay under *§ 362(d) of the United States Bankruptcy Code* to the extent necessary to set off certain amounts owing from and owed to the Debtors. n1

n1 Garden Ridge, L.P., Garden Ridge Corporation, Garden Ridge Management, Inc., Garden Ridge Finance Corporation, Garden Ridge Investments, Inc., and Garden Holdings, Inc. (collectively, the "Debtors" or the "Reorganized Debtors").

[**2]

The Court acquires core matter jurisdiction over this matter pursuant to *28 U.S.C. § 157(a), (b)* and *1334(b)*. Upon an examination of the parties' respective briefs and supporting documentation, and after conducting a hearing on the matter, the following findings of fact and conclusions of law are hereby rendered:

Garden Ridge Corporation and its jointly administered affiliate co-debtors (the "Debtors") operate home decor retailers with 35 stores in 13 states throughout the South, Midwest, and Mid-Atlantic regions of the United States. Garden Ridge Management, Inc. ("GRM") is a management services company that employs all of the staff and management utilized at the Garden Ridge stores. Garden Ridge, L.P. ("GRLP"), the entity that operates all of the Garden Ridge stores, pays GRM a fee for the use of GRM's employees in its stores. GRM holds a one percent (1%) general partnership interest in GRLP, with the remaining 99% being held by Garden Ridge Investments, Inc.

[*631] On January 28, 2001, Ferguson executed an employment agreement (the "Employment Agreement") whereby he was to become a member of Garden Ridge's Executive Committee as the Senior Vice President -- Supply Chain. [**3] n2 The Employment Agreement provided that in the event that he was released without cause, Ferguson would receive one year of base salary. The Agreement also provided for the payment of certain relocation costs (including customary real estate commissions up to 6% maximum on the sale of Ferguson's

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

existing house) in conjunction with Ferguson's move to Houston.

n2 Exhibit A to Debtors' Objection.

On January 31, 2003, due to a delay in the sale of his house in Michigan, Ferguson executed a promissory note in favor of GRLP in the principal amount of $ 250,000 (the "Note"). n3 The Note became due and payable upon the earlier of (i) thirty (30) days after the closing of the sale of Ferguson's real property in Michigan, (ii) the date of Ferguson's termination of employment (with or without cause), and (iii) December 31, 2003. Since Ferguson's house remained unsold, the Note was renewed annually. At this time, it is undisputed that the full face amount of the Note remains due.

n3 Exhibit C to Debtors' Objection.

[**4]

Ferguson was terminated on September 12, 2003. The parties disagree on whether Ferguson's termination was for cause. Ferguson has initiated a $ 310,000 cause of action against GRM and GRLP in state court in Texas (the "State Court Action") seeking payment of $ 250,000 in severance pay (comprising one year of base salary), and $ 60,000 in unpaid relocation costs. n4

n4 Exhibit D to Debtors' Objection.

On February 2, 2004, the Debtors filed for protection under chapter 11 of the Bankruptcy Code. The schedules filed by GRM (the "GRM Schedules") n5 included an unliquidated claim of Ferguson related to the State Court Action. No accounts receivable from Ferguson were listed on the GRM Schedules. Because GRLP was a named defendant in the State Court Action, the schedules filed by GRLP (the "GRLP Schedules") n6 also included an unliquidated claim of Ferguson. The GRLP Schedules listed the Note payable from Ferguson.

n5 Exhibit E to Debtors' Objection.

[**5]

n6 Exhibit F to Debtors' Objection.

On April 16, 2004, Ferguson filed an unsecured, non-priority claim in the amount of $ 310,000 (the "Claim"). n7

n7 Exhibit G to Debtors' Objection.

The consolidated chapter 11 plan of GRM and GRLP (the "Plan"), along with the other Garden Ridge entities, was confirmed on March 29, 2005. n8

n8 Exhibit 10 to Debtors' Post Hearing Memorandum.

Ferguson asserts that the amount of $ 250,000 owed by Ferguson to GRLP on the Note should be setoff by the amount of $ 310,000 owed by the Debtors to Ferguson for severance fees and various unpaid relocation costs. Ferguson argues that the net result would place him in the position of an unsecured creditor for the $ 60,000 deficiency outstanding.

"A creditor who has the right [**6] to setoff may obtain relief from the automatic [*632] stay in order to implement the setoff." *In re Dye, 2004 Bankr. LEXIS 2320, 2004 WL 2249503, *7 (Bankr. M.D. N.C. 2004); In re Stienes, 285 B.R. 360, 362 (Bankr. D. N.J. 2002)* ("In order to exercise a valid right of setoff, a creditor must move for relief from the automatic stay under *11 U.S.C. § 362(d)*."). "The right of setoff (also called offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.' Although no federal right of setoff is created by the Bankruptcy Code, *11 U.S.C. § 553(a)* provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18, 116 S. Ct. 286, 133 L. Ed. 2d 258 (1995).* Section 553(a) provides, in relevant part, that:

> this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement [**7] of the case . . .

*11 U.S.C. § 553(a).* "The burden of proof is on the party asserting the right to set-off." *E.g., In re Lason, Inc., 314*

Case 1:06-cv-00213-GMS    Document 11-2    Filed 07/20/2006    Page 7 of 25

Page 3

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

*B.R. 296, 305 (Bankr. D. Del. 2005); In re Bennett Funding Group, Inc., 212 B.R. 206, 212 (B.A.P. 2nd Cir. 1997).* Whether to allow setoff is a determination within the sound discretion of this Court. *E.g., In re Continental Airlines, 218 B.R. 324, 328 (D. Del. 1997)* (citing *United States on behalf of IRS v. Norton, 717 F.2d 767, 772 (3d Cir. 1983)); HAL, Inc. v. United States (In re HAL, Inc.), 196 B.R. 159, 161 (B.A.P. 9th Cir. 1996)* ("Whether or not to allow setoff pursuant to *§ 553* is left to the sound discretion of the bankruptcy court."); *In re Bangert, 226 B.R. 892, 903 (Bankr. D. Mont. 1998).*

To enforce a setoff right, "[a creditor] must establish that (1) it has a right of setoff under nonbankruptcy law; and (2) this right should be preserved in bankruptcy under *§ 553." In re HAL, Inc., 196 B.R. at 161; In re Atanasov, 221 B.R. 113, 117 (D.N.J. 1998)* ("Courts may look to state law in order [**8] to determine whether a setoff has occurred, however, the granting or denial of the right to a setoff depends upon the terms of *section 553*, and not upon the terms of state statutes or laws."); *In re Tarbuck, 318 B.R. 78, 81 (Bankr. W.D. Pa. 2004)* ("The threshold question in every case involving an asserted right of setoff is the source and validity of the underlying right.").

To determine which state's law to apply, the Court turns to Delaware choice of law rules. *E.g., In re PHP Healthcare Corp., 128 Fed. Appx. 839, 843 (3d Cir. 2005); In re Eagle Enterprises, Inc., 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998)* (citing *Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941))* ("In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state."). The Note includes a choice of law provision stating that it is governed by Texas law. Ferguson's action is a breach of contract claim brought in Texas state court, and arising from an employment agreement executed and performed in Texas. Therefore, the Court turns [**9] to Texas law to determine whether Ferguson has a right to setoff. *See Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc., 350 F. Supp. 2d 582, 595 (D. Del. 2004)* ("Under Delaware [choice of law rules], express choice of law provisions in contracts are generally given effect."); *Matter of Deemer Steel Casting Co., Inc., 117 B.R. 103, 107 (Bankr. D. Del. 1990)* ("In cases sounding [*633] in contract, Delaware's conflicts of law rules require application of the law of the state with the most significant contacts."). Therefore, it is clear, and undisputed by the parties, that Texas laws of setoff applies.

Under Texas law:

Setoff is a form of equitable counterclaim which brings together obligations of parties opposing each other and, by judicial action, makes each obligation extinguish the other. The object of equitable setoff is to adjust the demands between the parties and allow a recovery of only the balance that is due. In order for one demand to be set off against another, both demands must mutually exist between the same parties. Indeed, setoff is proper only where demands are mutual, between the same parties, and in the same capacity or [**10] right.

*Capital Concepts Properties 85-1 v. Mutual First, Inc., 35 F.3d 170, 175 (5th Cir. 1994)* (citations omitted). Similarly, "*section 553(a)* recognizes and preserves rights of setoff where four conditions exist: (1) The creditor holds a claim' against the debtor that arose before the commencement of the case; (2) The creditor owes a debt' to the debtor that also arose before the commencement of the case; (3) The claim and debt are mutual'; and (4) The claim and debt are each valid and enforceable." *See, e.g., 3 Collier on Bankruptcy P 553.01 [1], In re Czyzk, 297 B.R. 406, 409 (Bankr. D. N.J. 2003); Pardo v. Pacificare of Tex., Inc. (In re APF Co.), 264 B.R. 344, 354 (Bankr. D. Del. 2001).*

The effect of setoff is to elevate "an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee v. Schweiker, 739 F.2d 870, 875 (3d Cir. 1984); In re Health Management Ltd. Partnership, 332 B.R. 360, 363-64 (Bankr. C.D. Ill. 2005).*

The first two elements of setoff are uncontested in this case. Both debts arose pre-petition. The parties [**11] have also agreed to separately brief and argue the validity and enforceability of the Ferguson claim at a separate time. n9 Therefore, the issue to be determined by the Court at this time is whether Ferguson has met his burden of showing by a preponderance of the evidence, that the Note to GRLP and the state court action against GRLP and GRM are "mutual" for the purposes of Texas law and *§ 553.*

---

n9 Debtors' Objection, at 8 n.3.

---

"To establish its right to setoff under *Section 553 of the Bankruptcy Code*, the creditor must show mutuality of obligation. *BEA Sys. v. Shubert (In re Winstar Communs.), 315 B.R. 660, 662-63 (D. Del. 2004).* "Mutuality of obligations is determined by state law." *In re Czyzk,*

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

297 B.R. at 409. Under Texas and federal law, "mutuality of obligation exists when debts are owing between the same parties in the same right or capacity." *E.g., Mullen v. Cheatham, 1999 Tex. App. LEXIS 9109, 1999 WL 1095917, *3 (Tex. App. 1999); Brook Mays Organ Co., Inc. v. Sondock, 551 S.W.2d 160, 166 (Tex. Civ. App. 1977);* [**12] *In re Wilson, 69 B.R. 960, 965 (Bankr. N.D. Tex. 1987); see also In re Winstar Communs., 315 B.R. at 662-63; Buchanan v. Kerr-McGee Energy Servs. (In re GPR Holdings, L.L.C.) 2004 Bankr. LEXIS 1286, 2004 WL 3007080, *4 (Bankr. N.D. Tex. 2004).* "For mutuality to exist, each party must own his claim in his own right severally, with the [*634] right to collect in his own name against the debtor in his own right and severally." *Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1036 (5th Cir. 1987); In re Taylor Motors, 60 B.R. 760, 763 (Bankr. D. Nev. 1986)* ("Mutuality of the debt and claim means that the creditor is indebted to the debtor who likewise owes a debt to the creditor . . . ."). For setoff purposes, the mutuality requirement is strictly construed. *E.g., In re Bennett Funding Group, Inc., 212 B.R. at 212; In re Clemens, 261 B.R. 602, 606 (Bankr. M.D. Pa. 2001).*

A triangular setoff occurs where "A attempts to offset an obligation owed by B against B's debt to C. Setoffs of this kind are not permitted under *section 553.*" *In re KZK Livestock, Inc., 221 B.R. 471, 480 (Bankr. C.D. Ill. 1998); In re HAL, Inc., 196 B.R. at 163* [**13] ("The general rule, however, holds that triangular setoffs among related parties do not meet the mutuality requirement."); *U.S. Aeroteam, Inc. v. Delphi Automotive Systems, LLC (In re United States Aeroteam), 327 B.R. 852, 864, 327 B.R. 852, 2005 Bankr. LEXIS 1900, (Bankr. S.D. Ohio 2005)* ("Consequently, a triangular setoff,' . . . is prohibited because there is no mutuality of debt between two parties.").

Two exceptions have been recognized to the principle that triangular setoffs lack the requisite mutuality for setoff. First, courts have held that setoffs involving separate governmental agencies may satisfy the mutuality requirement under § *553. E.g., In re HAL, Inc., 196 B.R. at 163; In re U.S. Aeroteam, Inc., 327 B.R. at 864 n.9, 2005 Bankr. LEXIS 1900* (citing *United States v. Butler, 92 F.3d 960, 1996 WL 33403850 (Bankr. S.D. Ga. 1996)*) ("This case does not require the court to address triangular setoffs involving separate government agencies. Under certain circumstances, these types of triangular setoffs have been allowed."); *In re Nuclear Imaging Systems, Inc., 260 B.R.at 733-34* (citing *Cherry Cotton Mills v. United States, 327 U.S. 536, 66 S. Ct. 729, 90 L. Ed. 835, 105 Ct. Cl. 824, 1946-1 C.B. 228 (1946)*) ("The vast majority of courts have concluded, within the [**14] confines of a bankruptcy case, that all agencies of the United States constitute a single unitary creditor' for pur-

poses of setoff under *section 553.*"). The second exception is that an express agreement between the related entities may created mutuality for setoff purposes. *E.g., In re U.S. Aeroteam, Inc., 327 B.R. at 865, 2005 Bankr. LEXIS 1900* ("Generally, courts are in agreement that an assignment of rights can create mutuality for setoff purposes.").

Ferguson argues that mutuality exists in this case, since 1) Ferguson alleges that he was employed by Garden Ridge, collectively, and not solely by GRM, as alleged by the Debtors; 2) that GRM and GRLP were, for practical purposes, a single entity, and 3) the several entities of Garden Ridge were consolidated into a single entity, the Reorganized Debtor, through the Plan. Finally, Ferguson argues that even if a triangular set-off existed, these circumstances fall within a recognized exception permitting setoff, since the parties intended that the obligations of the Note to GRLP would compensate GRM for making the Loan.

The Debtors, however, argue that the debts are not mutual, asserting this situation presents an impermissible "triangular [**15] setoff," since Ferguson was employed by GRM, and the note was payable to GRLP. Alternatively, the Debtors argue that Ferguson, as a fiduciary of the Debtors, cannot effectuate a setoff.

### A. Mutuality

#### 1. Identity of Ferguson's Employer

The parties dispute whether GRM was Ferguson's employer, or whether Ferguson [*635] was employed collectively by the various entities of Garden Ridge, including GRLP.

The Debtors argue that the requisite mutuality does not exist, since Ferguson was employed by GRM, and the note was payable to GRLP. The Debtors rely primarily on Ferguson's paychecks and W-2 Form, which clearly state that "Garden Ridge Management, Inc." was Ferguson's employer. The parties do not dispute that GRM and GRLP were, at all times prior to filing, distinct legal entities.

Ferguson argues that despite the fact that GRM appeared on the paychecks and W-2 Form, GRM's payroll account was entirely funded and controlled by GRLP. Ferguson also notes that GRLP was the entity responsible for severance obligations of the Debtors. Ferguson notes that the Employment Agreement refers only to "Garden Ridge," and makes no mention of GRM, or any specific entity of the Debtors. Ferguson [**16] offers his own testimony that he was unaware of the specific entity that was his true employer. Finally, contemporaneously with the Note, Ferguson received a letter which states:

Case 1:06-cv-00213-GMS    Document 11-2    Filed 07/20/2006    Page 9 of 25

Page 5

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

Contemporaneously with the execution of this letter, you are executing the Note, and Garden Ridge, L.P. (the "Company") is making the loan to you evidenced by the Note. You currently are serving as an employee of the Company. . . .

Sincerely,

GARDEN RIDGE, L.P.,

By: Garden Ridge Management, Inc.,

General Partner n10

n10 Exhibit 2 to Ferguson's Post-Hearing Brief.

Ferguson's arguments on this point are misguided. Ferguson's subjective belief, however well founded, does not overcome the legal conclusion that the debts are not mutual. For independent reasons, Garden Ridge created and maintained GRM and GRLP as distinct legal entities. According to his paychecks and his W-2 tax form, Ferguson was paid, and was formally employed, by GRM. The assertion that GRLP controlled the payroll account does not change this legal status. **[**17]** Ferguson cannot create the required mutuality by naming GRLP as a defendant in the State Court Action, despite the fact that his cause of action arose from his employment by GRM.

It is settled law that a triangular setoff exists even where the parties are related subsidiaries. *E.g., In re HAL, Inc., 196 B.R. at 163* ("Thus, in the corporate context, it is well-established that one subsidiary may not set off a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary.'"); *Depositors Trust Co. v. Frati Enterprises, 590 F.2d 377, 379 (1st Cir.1979))* ("It is well established that one subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary."); *Inland Steel Co. v. Berger, 327 F.2d 401 (7th Cir.1964)* ("This argument appears to be supported by those cases which hold that a parent corporation may not set-off a debt owed its subsidiary by an entity against a debt it owes to the same entity."); *In re Sentinel Products Corp., 192 B.R. 41, 46 (N.D. N.Y. 1996)* (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc., 882 F.2d 615, 618 n.2 (2d Cir. 1989);* **[**18]** *In the Matter of Elcona Homes Corp., 863 F.2d 483, 486-87 (7th Cir. 1988); Depositor's Trust Co. of Augusta v. Frati Enters., 590 F.2d at 379)* ("a subsidiary's debt may not be setoff against **[*636]** the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances."); *In re KZK Livestock, Inc., 221 B.R. at 480*

("Thus, two entities, even if related, may not aggregate their debts and claims for setoff purposes. For example, a subsidiary may not offset a debt to the debtor against a debt the debtor owes to another related subsidiary. . . ."); *In re Baja Boats 1997 Bankr. LEXIS 2125, 1997 WL 811694, *7 (Bankr. N.D. Ohio 1997)* ("The primary requirement of mutuality is that the relevant claim and debt must exist between the same parties. Therefore, two entities, even if related, may not aggregate their debts and claims for setoff purposes."); *In re Hill Petroleum Co., 95 B.R. 404, 411-12 (Bankr. W.D. La. 1988)* (citing 4 COLLIER ON BANKRUPTCY § 553.042 at 553-19 (1988)); *Matter of Fasano/Harriss Pie Co., 43 B.R. 864, 870 (Bankr. W.D. Mich. 1984)* (citations omitted) ("The **[**19]** same rule applies with a parent corporation and a wholly owned subsidiary. Since an intercorporate relationship is insufficient to meet the mutuality requirement in an offensive claim of setoff by a member at the corporate family against a third party, it likewise is insufficient to meet the mutuality requirement in a third party claim of setoff against a member of the corporate family."); *In re Virginia Block Co., 16 B.R. 560, 562 (Bankr. W.D. Va. 1981)* ("Furthermore, a corporation may not setoff the right of an associated, wholly owned corporation, even though local custom permits such a setoff.").

This principle has also been applied in situations involving partners in partnerships. *See Capital Concepts Properties 85-1 v. Mutual First, Inc., 35 F.3d 170, 175 (5th Cir. 1994)* (finding that the "premise that the debt owed to a partnership creditor [] may be set off against the claim of an individual partner [] against the partnership creditor does not find any clear support in the decided cases."); *In re Nuclear Imaging Systems, Inc., 260 B.R. 724, 733 (Bankr. E.D. Pa. 2000)* (citing *Gray v. Rollo, 85 U.S. [18 Wall.] 629, 21 L. Ed. 927 (1873))* **[**20]** (mutuality for purposes of setoff is absent when a partnership has a claim against an individual but the individual has a claim against a partner of the partnership); *In re Ingersoll, 90 B.R. 168, 171 (Bankr. W.D. N.C. 1987)* ("This is consistent with other authorities which have found no mutuality in situations involving parent corporations and subsidiaries, sister corporations, and partnerships and individual partners."); *In re Virginia Block Co., 16 B.R. at 562* ("Strict construction of the element of mutuality means that a debt due an individual partner cannot be setoff against a claim of the partnership.").

This case does not present a permissible triangular setoff based upon an agreement between the related entities. Although Ferguson argues that the note to GRLP was intended to directly, or indirectly, benefit GRM, he has not alleged that any formal or express agreement between GRM and GRLP existed. *Depositors Trust Co. of Augusta v. Frati Enterprises, Inc., 590 F.2d at 379*

Case 1:06-cv-00213-GMS   Document 11-2   Filed 07/20/2006   Page 10 of 25

Page 6

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

("Thus, although Bangor and Augusta are basically the same bank, we cannot treat them as such, in the absence of an agreement by the bankrupt to treat [**21] the two banks as one."); *In re Hill Petroleum Co.*, 95 B.R. at 412 ("The narrow exception to the rule against three party, "triangular" setoffs, occurs where there is a formal agreement by the debtor that two entities may aggregate debts owed to and from the debtor."); *In re Lang Machinery Corp., 1988 Bankr. LEXIS 1667, 1988 WL 110429, *5 (Bankr. W.D. Pa. 1988)*; *In re Balducci Oil Co., Inc., 33 B.R. 847, 853 (Bankr. D. Colo. 1983)* (citations omitted) ("The courts have found mutuality between three parties, as a matter [*637] of contract law, where there was an express contractual agreement clearly evincing the intent of the parties to treat the parent and subsidiary as one entity.").

Therefore, the formal legal relationship between the parties herein presents an impermissible triangular setoff, as the required mutuality of the parties does not exist. To the extent that Ferguson argues that the entities operated as a single entity, and therefore should be considered to be as the same entity for setoff purposes, such arguments are addressed below.

**2. Whether GRM and GRLP Should Be Treated as One Entity**

Ferguson argues that Garden Ridge, as a collective unit, operated in a [**22] manner such that the Debt and the Ferguson Claim involve the same entity. Therefore, Ferguson argues that the Court should disregard the fact that GRM and GRLP were separate legal entities. Texas law provides that in several broad instances, the corporate entity may be disregarded, including "1) when the corporation is the alter ego of its owners or shareholders; 2) when the corporation is used for illegal purposes; and 3) when the corporation is used as a sham to perpetrate a fraud." *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d 627, 629-30 (5th Cir.1994)* (citing *Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1496 (5th Cir.1993)).*

Among the reasons recognized in the past for disregarding the corporate fiction are: (1) when it is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where it is used to evade an existing legal obligation; (4) where it is employed to achieve or perpetrate a monopoly; (5) where it is used to circumvent a statute; and (6) where the corporate fiction is re-

lied upon as a protection [**23] of crime or to justify wrong.

*Carlson Mfg. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3 (Tex. App. 2005)*; *Castleberry v. Branscum, 721 S.W.2d 270, 271, 29 Tex. Sup. Ct. J. 481 (Tex.1986).*

The purpose of disregarding the corporate entity in these instances is to prevent fraud, illegality, or to avoid an otherwise inequitable result. *See, e.g., Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d at 630* ("The purpose of disregarding the corporate fiction is to prevent the corporation's owners from using the corporate entity as a cloak for fraud or illegality."); *Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3* ("However, the purpose of the single business enterprise theory, like the alter ego theory and other doctrines designed to pierce the corporate veil, is to prevent an inequitable result."); *SSP Partners v. Gladstrong Invs. (USA) Corp., 169 S.W.3d 27, 2005 WL 1693765, *1 (Tex. App. 2005)* ("Texas recognizes the single business enterprise doctrine' to prevent an entity from relying upon corporate form to evade an existing debt or legal obligation."); *Goldstein v. Mortenson, 113 S.W.3d 769, 780 (Tex. App. 2003)* [**24] ("We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."). Therefore, the corporate entity will not be disregarded unless there are compelling reasons to do so. *See, e.g., Barrera v. Roscoe, Snyder & Pac. Ry. Co., 385 F.Supp. 455, 461 (N.D. Tex. 1973)* (quoting *[*638] Ruberoid Co. v. North Tex. Concrete Co., 193 F.2d 121, 122 (5th Cir. 1952))* ("The doctrine of separate entity fills a useful purpose in business life and the courts are hesitant to disregard it unless the facts presented demonstrate some misuse of the corporate privilege or the need of limiting it in order to do justice."); *Cementos de Chihuahua, S.A. de C.V. v. Intermodal Sales Corp., 162 S.W.3d 581, 585-86 (Tex. App. 2005)* (quoting *Lucas v. Texas Industries, Inc., 696 S.W.2d 372, 374 (Tex.1984))* ("disregard of the legal fiction of corporate entity' is an exception to the general rule which forbids disregarding corporate existence.'"); *Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3* [**25] ("Because Texas law presumes that two separate corporations are distinct entities, the courts will not disregard the separate legal identities of corporations unless that relationship is used to defeat public convenience, to justify wrongs such as violation of the anti-trust laws, to protect fraud, or to defend crime."); *Tigrett v. Pointer, 580 S.W.2d 375, 392 (Tex. Civ. App. 1978)* ("The general rule prohibits disregard of the corporate entity by a court unless that corporate entity is

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

used as a means of committing fraud or to justify wrong in the sense of a violation of law or of public policy."); *King v. Tubb, 551 S.W.2d 436, 445 (Tex. Civ. App. 1977)* ("As a general rule, the corporate entity will not be disregarded unless there are compelling reasons to disregard."). Texas courts have been particularly hesitant to disregard the corporate entity in cases involving contracts. *Mancorp, Inc. v. Culpepper, 836 S.W.2d 844, 847-48 (Tex. App. 1992)* ("The overriding public policy necessary to disregard the corporate entity must be more stringent in contract cases than in tort cases because in contract cases the plaintiff has an opportunity [**26] to select the entity with which he deals as opposed to tort cases in which no such choice exists . . . . In such a situation, a court should not resort to the drastic exception to the general rule that the corporate entity must remain inviolate.").

Texas law places the burden of showing that the Court should disregard the corporate fiction on the party seeking to treat the entities as a single unit. E.g., *PHC-Minden, L.P. v. Kimberly-Clark Corp., 2005 Tex. App. LEXIS 6569, 2005 WL 1979102, *4 (Tex. App. 2005)* ("The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation."); *Wortham v. Dow Chem. Co., 179 S.W.3d 189, 2005 WL 2786996, *4 (Tex. App. 2005)*; *Mancorp, Inc. v. Culpepper, 836 S.W.2d at 847* (The "burden of proof is on the plaintiff to prove harm in order to pierce the corporate veil.").

Ferguson presents persuasive evidence to show that the Debtors' operations overlapped substantially. This Court found that such evidence was sufficient to show that the Debtors' cases should be substantively consolidated, stating:

> In the Martin Declaration, Martin attested to the following [**27] facts, which were not controverted at the Confirmation Hearing: (a) the Debtors share common management, (b) the Debtors prepare and disseminate consolidated financial reports, (c) the Debtors file consolidated federal tax returns, (d) the Debtors utilize a centralized cash management system, and (e) each of the Debtors, other than Garden Holdings, Inc., was a co-obligor under the Debtors' pre-petition working capital facility and the DIP Credit Facility. Based on the Martin Declaration, the Court finds that there is a substantial identity and inseparable [*639] relationship between the Debtors and that the benefits

of consolidation outweigh any harm or prejudice to creditors." n11

> n11 Exhibit 17 to Ferguson's Post-Hearing Brief.

The Debtors do not argue that such evidence undisputedly establishes that there was substantial identity and inseparable relationship between GRM and GRLP. In order for the Court to disregard the separately maintained corporate entities, however, Ferguson must still show that the [**28] Debtors misused the corporate privilege, or that it would be necessary to avoid an inequitable result.

> There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's actions. Merely showing a blending of activities between the parent and subsidiary, such that they may have had some or all of the same directors or officers, filed consolidated income tax returns, shared the same corporate logo, conducted inter-corporate business, or officed in the same building, is not alone sufficient to make the parent liable.
>
> . . . This was not sufficient to show that the parent/subsidiary relationship had been used as part of a basically unfair device to achieve an inequitable result, or that the subsidiaries were organized and operated as mere tools or business conduits of the parent.

*Trailways, Inc. v. Clark, 794 S.W.2d 479, 489-90 (Tex. App. 1990)*; *Mortgage and Trust, Inc. v. Bonner & Co., Inc., 572 S.W.2d 344, 348-49 (Tex. Civ. App. 1978)* ("As a general rule, two or more corporations are separate and [**29] distinct legal entities, and the separate identity of each will not be disregarded in order to impose liability on one corporation for the acts of another corporation merely because of: a) overlapping stock ownership; b) a duplication of some or all of the directors or officers; or c) an exercise of the control that stock ownership gives to stockholders.").

Case 1:06-cv-00213-GMS    Document 11-2    Filed 07/20/2006    Page 12 of 25

Page 8

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

To the extent that Ferguson argues that GRM is the "alter ego" of GRLP, Ferguson has not alleged that the Debtors maintained GRM and GRLP as separate entities for fraudulent purposes. Under Texas law, the alter ego doctrine requires a showing of fraud. *North American Van Lines, Inc. v. Emmons, 50 S.W.3d 103, 119 (Tex. App. 2001)* ("The alter ego' theory generally involves proof of fraud, i.e., proof that the corporation is organized and operated as merely a tool or business conduit of another corporation. At a minimum, the plaintiff must prove that he has fallen victim to a basically unfair device by which [the subsidiary] has been used to achieve an inequitable result.'"); *see also In re Carrousel Motels, Inc., 160 B.R. 993, 1002 (Bankr. S.D. Ohio 1993)* ("The alter ego doctrine by its nature [**30] does not admit of mutuality; the doctrine may not be used as a shield. That is, one may not disregard corporateness unless there has been misuse of corporateness."); *In re Bellanca Aircraft Corp., 56 B.R. 339, 398-99 (Bankr. D. Minn. 1985)* ("Thus, as a matter of corporate law, without alleging fraud or some other wrong, Petco will not be allowed to disregard Pinion's corporateness to establish mutuality of obligation.").

Alternatively, Ferguson argues that GRM and GRLP were operated as a single entity, and therefore should be [*640] treated as such for setoff purposes. "Texas recognizes the single business enterprise doctrine' to prevent an entity from relying upon corporate form to evade an existing debt or legal obligation." *SSP Partners v. Gladstrong Investments (USA) Corp., 169 S.W.3d at 43.*

> Factors to be considered in determining whether separate corporations should be treated as one enterprise include: (1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation's employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of [**31] another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations. . . .

*Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, [WL] at cc*3.*

Although Ferguson offers evidence of the close relationship between GRM and GRLP which may warrant application of these doctrines in other contexts, he has not shown that the corporate entity should be disregarded for setoff purposes. The single business enterprise theory, and other analogous doctrines, have been enforced by Texas courts to find that a master servant relationship existed for the purposes of imposing liability, or for purposes of determining jurisdiction and other procedural matters. *See Id. Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, [WL] at *3; Newspapers, Inc. v. Love, 380 S.W. 2d 582, 590, 7 Tex. Sup. Ct. J. 274 (Tex. 1964).* There is no apparent use of the doctrine to create mutuality for setoff purposes, and such a use does not fall within the recognized categories in which Texas courts have determined that the corporate entity should be disregarded. Such a use would be inappropriate in this case, since denying setoff would not [**32] allow either party to evade an existing legal obligation or alter the legal rights of the parties, nor does Ferguson allege that the Debtors have created separate legal entity for fraudulent or wrongful purposes. *See In re Vehm Engineering Corp., 521 F.2d 186, 190-91 (9th Cir. 1975)* ("The Referee specifically found that although AIF and TWF were controlled and dominated by the same person, the two corporations were at all relevant times separate legal entities.' Hence, the debts are not mutual' and may not be offset against each other."); *In re Fairfield Plantation, Inc., 147 B.R. 946, 954-55 (Bankr. E.D. Ark. 1992)* ("In light of the absence of evidence that FAC was formed to defeat justice, perpetrate fraud, or to evade contractual or tort responsibility this Court, applying Georgia law, finds that FAC has a separate corporate identity from that of FPI. Accordingly, the party against which PEGI has a claim (FPI) is different from the party to which PEGI owes a debt (FAC) and mutuality does not exist."). In this case, Ferguson could maintain his state court action, and his legal rights would not be otherwise affected.

Therefore, Ferguson has not [**33] provided a persuasive basis to show that the Court should ignore the fact that GRM and GRLP are distinct legal entities.

### 3. Substantive Consolidation to Create Mutuality

Ferguson argues that the substantive consolidation of the Debtors created the necessary mutuality. The Plan states,

> Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other [*641] legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by this Plan. n12

> n12 Plan, at 36.

Case 1:06-cv-00213-GMS    Document 11-2    Filed 07/20/2006    Page 13 of 25

Page 9

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

The Plan also states that

> On the Confirmation Date, the Chapter 11 Cases of all of the Debtors shall be substantively consolidated for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distributions. . . .

> Such substantive consolidation shall not (other than for purposes related to the Plan) affect (i) the legal and [**34] corporate structure of the Reorganized Debtors. . . . n13

n13 Plan, at 25-26.

The language of the Plan states that the Debtors retained all defenses that they held prior to the Petition date. Ferguson does not suggest that the GRM and GRLP entities were consolidated prior to the time of the subject transactions. There is no language in the Plan which would suggest that substantive consolidation should be given retroactive effect. "The substantive consolidation of several estates means one thing and one thing only-that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights. It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation." *In re Murray Industries, Inc., 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991)*; *Nickless v. Avnet, Inc. (In re Century Elecs. Mfg.), 310 B.R. 485, 493 (Bankr. D. Mass. 2004)* [**35] ("Moreover the Defendant's argument that the confirmation order provides for retroactive substantive consolidation is incorrect. The language is forward-looking. It was intended for ease of administration, not as an opportunity for the Defendant to enlarge its new value defense after the fact. It would be unfair to burden the consolidated estate with a *nunc pro tunc* application that was not contemplated when the Confirmation Order entered."). As stated in the Plan, substantive consolidation was for certain prospective purposes related to the Plan. One of those purposes was not to create mutuality so that Ferguson could enjoy the benefits of setoff.

## B. Ferguson as a Fiduciary

Finally, the Debtors argue that since Ferguson was an executive of Garden Ridge, he was subject to certain fiduciary duties, and is therefore barred from seeking to effectuate a setoff. Although it is not necessary, as Ferguson has failed to meet the mutuality requirement of setoff, this argument of the Debtors is not applicable in this instance. "Where a debt arises from a fiduciary duty or is in the nature of a trust, courts have held that there is no mutuality for setoff purposes. . . . In other [**36] words, setoff will not be permitted where granting it would have the effect of excusing or evading the [fiduciary] obligation." *Biggs v. Stovin (In re Luz Int'l, Ltd.), 219 B.R. 837, 848 (B.A.P. 9th Cir. 1998)* (citations omitted); *Levine v. Telco Sys. (In re World Access, Inc.), 324 B.R. 662, 685 (Bankr. N.D. Ill. 2005)* (citing *Libby v. Hopkins, 104 U.S. 303, 26 L. Ed. 769 (1881))* ("Where the liability of one claiming a set-off right arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts and claims does not exist, [*642] and such persons may not set-off a debt owing from the debtor against such liability."); *Dollar Bank, FSB v. Tarbuck (In re Tarbuck), 304 B.R. 718 at 721* ("For mutuality to exist, the debts must exist between the same parties in the same capacity, i.e., each must owe the other in his own name and not as a fiduciary."). "The rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt." *Western Dealer Mgmt. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262, 265 (9th Cir.1973).*

The fact that one of the parties has a fiduciary [**37] duty in some context, however, does not necessarily preclude mutuality. *In re Fox Bean Co., Inc., 287 B.R. 270, 287 (Bankr. D. Idaho 2002)* (citing 5 *COLLIER ON BANKRUPTCY PP 553.03[3][b]* and *553.03[3][c][ii]* ("the existence of a fiduciary relationship need not prevent mutuality"). A distinction must be drawn between different types of fiduciary relationships. "First, mutuality may be found if setoff would not violate the fiduciary obligation in question, as in the case of certain types of security deposits. Second, mutuality may exist if the party asserting the right of setoff is not the one acting as a fiduciary. Third, the rule does not prevent setoff if the obligations sought to be offset between the parties are unrelated to either party's fiduciary responsibilities." 5 *COLLIER ON BANKRUPTCY PP 553.03[3][c][ii]* (footnotes omitted); *Allegaert v. Perot, 466 F.Supp. 516, 519 (S.D.N.Y. 1978).*

In this case, the Note did not arise out of Ferguson's fiduciary duty. Although Ferguson received a loan in conjunction with his moving expenses, it was not incurred as an exercise of his fiduciary [**38] duties. The fact, alone, that Ferguson was in a position charged with

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

certain fiduciary duties does not *per se* ban him from asserting any right to setoff.

Accordingly, Ferguson's motion for relief from stay in order to effectuate a setoff is not well premised and is hereby denied. Each party is to bear its respective costs.

**IT IS SO ORDERED.**

Dated, this 10th day of February, 2006.

/s/ Randolph Baxter

UNITED STATES BANKRUPTCY JUDGE

**JUDGMENT**

**In Delaware, in said District, on this 10th day of February, 2006.**

**A Memorandum Of Opinion And Order having been rendered by this Court in this matter.**

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Ferguson's motion for relief from stay in order to effectuate a setoff is not well premised and is hereby denied. Each party is to bear its respective costs.**

**IT IS SO ORDERED.**

/s/ Randolph Baxter

**UNITED STATES BANKRUPTCY JUDGE**

# Exhibit C

LEXSEE 1994 US DIST LEXIS 17651

**BAXTER HEALTHCARE CORPORATION, a Delaware corporation and BAXTER DIAGNOSTICS INC., a Delaware corporation, Plaintiffs, v. MEDICAL LABORATORY AUTOMATION, INC., a New York corporation, and ORTHO DIAGNOSTIC SYSTEMS, INC., a New Jersey corporation, Defendants.**

**No. 94 C 4558**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1994 U.S. Dist. LEXIS 17651; 1995-1 Trade Cas. (CCH) P70,906*

**December 1, 1994, Decided
December 9, 1994, DOCKETED**

**JUDGES:** [*1] Suzanne B. Conlon, United States District Judge

**OPINIONBY:** Suzanne B. Conlon

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Baxter Healthcare Corporation ("Baxter") sues Medical Laboratory Automation ("MLA") and Ortho Diagnostics, Inc. ("Ortho") for antitrust violations and for terminating its exclusive distributorship without sufficient notice. This court issued a temporary restraining order ("TRO") on August 23, 1994. The TRO subsequently was modified by consent of the parties on August 25, 1994, and by the court on September 14, 1994. The court denied Baxter's motion for a preliminary injunction on October 3, 1994, finding that Baxter had shown neither a likelihood of success on the merits of its claims nor irreparable harm in the absence of a preliminary injunction. The background of this case is discussed fully in the October 3, 1994 findings of facts and conclusions of law ("the October 3 opinion").

Presently before the court are Baxter's motions to hold an evidentiary hearing on a "critical contested issue of fact," to find the fact in Baxter's favor, and to amend the October 3 opinion accordingly. Specifically, Baxter challenges the court's conclusion that "neither party presents projections of [*2] the time period for new firms to enter the hemostasis instrument market" but that "IMS, however, appears able to enter immediately." Id. at Conclusion 31.

### DISCUSSION

In its attempt to secure a preliminary injunction, Baxter argued that the alliance's refusal to supply Baxter with hemostasis instruments denied Baxter an essential input necessary to compete in the hemostasis systems market. The court found that Baxter did not establish it was likely to prevail on this claim. The essential input claim suffered from several defects. Most significantly, Baxter failed to show that it could not obtain an alternate source of instrument supply. The court specifically noted that INS was an obvious choice for Baxter. INS manufactured the instrument formerly marketed by Ortho, an instrument that commands approximately nine percent of the hemostasis instrument market. Ortho severed its relationship with INS when Ortho joined the alliance, but in the process Ortho conveyed to INS its technology rights in the instrument. Thus, the court found that INS now has the infrastructure and the legal right to produce the instrument. The court noted that INS, which has little distribution or marketing [*3] capability, had been "freed up" by its severance from Ortho and needed a distributor for the instrument. Baxter, on the other hand, needed an instrument supplier to compete in the hemostasis systems market. Because Baxter failed to establish that it could not distribute the INS instrument, the court held that Baxter did not demonstrate a likelihood of success on the merits of its essential input claim.

Baxter proposes a brief hearing to "amplify" and "elaborate" on its argument that INS is not an "acceptable" supplier for Baxter. Baxter combines its motion for an evidentiary hearing with a motion to alter judgment pursuant to *Federal Rules of Civil Procedure 52(b)* and *59(e)*. Motions to alter or amend a judgment serve a narrow purpose. The rulings of a district court "are not intended as first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting v.*

Case 1:06-cv-00213-GMS    Document 11-2    Filed 07/20/2006    Page 17 of 25

Page 2

1994 U.S. Dist. LEXIS 17651, *; 1995-1 Trade Cas. (CCH) P70,906

*Gulfco Indus., 123 F.R.D. 282, 288 (N.D. Ill. 1988).* Rather, Rule 59 motions are generally granted only if the movant shows that the court made a mistake of law or fact, presents newly-discovered evidence that could not have been discovered previously, or if the court [*4] is persuaded that the result is unjust. See *Deutsch v. Burlington Northern R.R., 983 F.2d 741, 744 (7th Cir. 1992); Prince v. Unsecured Creditors Committee, 1994 U.S. Dist. Lexis 12589,* *7 (N.D. Ill. 1994);* 11 C. Wright & A. Miller, Federal. Prac. & Procedure § 2803 (1973 & Supp. 1994). A Rule 59 motion is not a vehicle to introduce new evidence or legal theories that could have been raised in the original motion, nor is it a place to argue old facts with new vigor. See *Lewis v. Hermann, 783 F. Supp. 1131, 1132 (N.D. Ill. 1991)* (citing *Publishers Resource, Inc. v. Walker-Davis Publications, Inc., 762 F.2d 557, 561 (7th Cir. 1985)).*

Baxter's motion fails for two reasons. First, Baxter effectively waived its opportunity for an evidentiary hearing. On August 25, 1994, the court held a hearing to adopt an expedited discovery schedule and to determine the format for the preliminary injunction hearing. The court noted that "this might be the kind of case where written submissions are more efficient than oral submissions" and suggested that the evidence be presented [*5] in "affidavit form and exhibits." 8/25/94 Tr. at 5. The court commented that "given the nature of the antitrust issues, the market information, the sales information, and that kind of technical information, it would be more helpful to me to have it in writing. I think it would make a better record, and it would save court time." 8/25/94 Tr. at 6. No objections were made to this format. Thereafter, Baxter submitted affidavits and exhibits, and vigorously participated in oral argument. Baxter did not request an evidentiary hearing or suggest that an evidentiary hearing was needed or would be preferable.

An evidentiary hearing is not required prior to ruling on a preliminary injunction motion. See *Stanley v. University of Southern California, 13 F.3d 1313, 1326 (9th Cir. 1994);* cf. *People ex rel. Hartigan v. Peters, 871 F.2d 1336, 1342 (7th Cir. 1989).* A party that rests on affidavits and other written submissions waives an evidentiary hearing. *Drywall Tapers & Pointers Local 1974 v. Local 530, 954 F.2d 69, 77 (2d Cir. 1992); Panther Systems II, Ltd. v. Panther Computer Systems, Inc., 783 F. Supp. 53, 63 n.5 (E.D.N.Y. 1991);* [*6] *Picker Intern'l v. Kodak Caribbean, Ltd., 826 F. Supp. 610, 612 (D.P.R. 1993).* Baxter did not seek an evidentiary hearing before the court ruled adversely to it. Rather, Baxter manifested its assent to written submissions by failing to object and by participating fully in the process suggested by the court. Before the adverse ruling, Baxter was content to rest on its written submissions. As a result, Baxter has waived an evidentiary hearing.

More importantly, however, Baxter's motion must be denied because the testimony it proffers would not change the result. Baxter's proposed hearing would center on the testimony of Carl Apfelbach, a Baxter vice-president, and Richard Aderman, Baxter's director of hemostasis. During the hearing, Apfelbach "would amplify the evidence presented in his affidavit" and Aderman "would elaborate on his affidavit statements that INS does not have the. . . ability to continue development of instruments or to enter the market immediately." Not. Ev. Hrng. at 2-3.

As discussed above, Baxter failed to support its motion for a preliminary injunction with persuasive evidence that INS could not presently produce the instrument that [*7] INS previously manufactured for Ortho. As a result, the court noted that IMS appeared able to reenter the market immediately. Likewise, INS seemed the obvious choice as a new instrument supplier for Baxter: INS and Baxter had lost their respective commercial complements. Thus, although there were other reasons for denying the preliminary injunction motion, the availability of INS' instruments alone was enough to show that Baxter is not likely to prevail on its monopolization and essential input claims.

Nothing in the affidavits or proposed testimony of Apfelbach and Aderman affect these findings. Apfelbach's affidavit does not even mention INS. See Apfelbach Aff., Baxter's P.I. Reply Ex. 2. Aderman's affidavit discusses INS only to note that Ortho discontinued funding INS' development of a new instrument and that completion of development would take one year. See Aderman Aff. PP 13-15. But Aderman's affidavit does not discuss INS' ability to produce the instrument that already exists -- that is, the instrument that Ortho sold under its name, that is accepted and used by approximately nine percent of the market, and that Aderman himself deemed competitively tantamount to MLA's [*8] instrument. See Aderman Aff. P 8. The issue is not the development of the latest instrument or Baxter's right to a new instrument of quality comparable to MLA's. The issue is whether Baxter can secure another supplier of hemostasis instruments, the essential input, so that it may compete in the hemostasis systems market. The summary judgment record suggests that Baxter could distribute INS' existing instrument. Baxter has not met its burden of showing that it cannot. The proffered testimony, focusing on the Ortho instrument in development and whether Baxter can find an "acceptable" substitute, would not establish that Baxter is entitled to injunctive relief at this stage of the proceedings.

## CONCLUSION

Baxter's motions for an evidentiary hearing and to alter or amend the judgment are denied.

1994 U.S. Dist. LEXIS 17651, *; 1995-1 Trade Cas. (CCH) P70,906

ENTER:                                    United States District Judge

Suzanne B. Conlon                              December 1, 1994

# **Exhibit D**

LEXSEE 1988 BANKR LEXIS 1667

**In Re: LANG MACHINERY CORPORATION, Debtor; EQUIBANK, Plaintiff
v. LANG MACHINERY COMPANY, INC., a Corporation, Defendant; In Re:
LANG MACHINERY CORPORATION, Debtor; EQUIBANK, Plaintiff v.
HILDEBRAND MACHINERY COMPANY, INC., Defendant**

**Bankruptcy No. 86-00415, Adversary Nos. 87-0347, 87-0346**

**UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT
OF PENNSYLVANIA**

*1988 Bankr. LEXIS 1667*

**October 19, 1988, Decided**

**COUNSEL:**

John R. O'Keefe, Jr., Esq., Peter N. Pross, Esq., Kincaid & McGrath, P.C., Pgh., PA., For Equibank

Ralph H. German, Esq., James J. Anfang, Esq., Cooper, German, Kelly & Purcell, P.C., Pgh., PA, For Lang Machinery Company, Inc. & Hildebrand Machinery Company, Inc.

**JUDGES: [*1]**

Judith K. Fitzgerald, United States Bankruptcy Judge

**OPINIONBY:**

FITZGERALD

**OPINION:**

MEMORANDUM OPINION

JUDITH K. FITZGERALD, UNITED STATES BANKRUPTCY JUDGE

The matters before the court are two complaints to recover accounts receivable filed by Equibank: one against Lang Machinery Company, Inc. (LMCI) at Adversary No. 87-0347 to which a counterclaim was filed by LMCI; the other against Hildebrand Machinery Company, Inc. (Hildebrand) at Adversary No. 87-0346, account debtors of Lang Machinery Corporation (Debtor). The parties consented to the entry by this court of a Final Order and the matters were tried together.

At Adversary No. 87-0347 judgment will be entered for Equibank against LMCI on certain storage charge claims, claims for reimbursement of expenses, and the balance due on LMCI's purchase of certain equipment from Debtor. Judgment will be entered for Equibank on LMCI's counterclaim for the cost of dismantling and shipping a Thompson [*2] Surface Grinder. At Adversary No. 87-0346 the court will enter judgment for Hildebrand on Equibank's petition for payment of storage charges. However, the court finds that Equibank is entitled to recover from Hildebrand the Debtor's share of the proceeds of sale of a Landis Plane Cylindrical Grinder and will enter judgment accordingly. The court rejects Hildebrand's and LMCI's setoff defenses.

The court's Findings of Fact and Conclusions of Law follow.

Debtor filed a Chapter 11 bankruptcy petition on February 26, 1986. On August 29, 1986, Bankruptcy Judge Markovitz, before whom the bankruptcy petition is pending, entered an order confirming a sale of certain equipment and machinery in which Debtor, LMCI, Hildebrand, and others had ownership interests. See Adversary No. 86-0356. On March 17, 1987, an order was entered granting Equibank relief from the automatic stay insofar as it affected Equibank's interests in Debtor's accounts receivable. Accordingly, Debtor is not a party to the instant actions.

Equibank is a banking institution authorized to conduct business in the Commonwealth of Pennsylvania. Hildebrand and LMCI are Pennsylvania corporations and have done business with the [*3] Debtor and with each other for several years.

On or about May 16, 1973, as partial security for loans extended or to be extended to the Debtor by Equibank's predecessor, Western Pennsylvania National Bank (WPNB), the Debtor and WPNB executed a written agreement by which Debtor granted to WPNB a security interest in present and future accounts receivable, inter alia. That Equibank has a perfected security interest in the Debtor's accounts receivable has not been challenged.

Debtor, Hildebrand, LMCI and sometimes others, were in the business of jointly buying equipment and machinery for resale. Equipment was stored on the business premises of one or the other of the co-owners until such time as it was resold. The co-owners then would split the proceeds according to their relative ownership interests. The parties did not charge each other fees for storing the items on their own premises but did share storage costs if it was necessary to house machinery or equipment at an unrelated facility which billed for the service.

EQUIBANK V. LMCI

From February of 1975 until approximately January, 1986, the Debtor leased certain real property from Charles J. Lang (Charles), President of LMCI, [*4] pursuant to a lease agreement dated February 1, 1975, between Charles and Debtor. See Lang Exhibit E. Charles is also the brother of David N. Lang (David), Debtor's President. From 1984 to the date of filing of Debtor's bankruptcy petition on February 26, 1986, Debtor periodically became delinquent in rent payments.

In March or April of 1984 David decided to liquidate Debtor's assets and wind up its business affairs. To that end, he notified Charles that the Debtor would not renew its lease. The decision to liquidate led to an oral agreement between David and Charles, on behalf of their respective corporations, that LMCI would hire Debtor's employees. The agreement also provided that LMCI would reimburse Debtor for expenses incurred by Debtor in connection with sales activities performed by it or its employees on behalf of LMCI. At the same time, Debtor remained in possession of the rented premises to facilitate its pre-bankruptcy attempt to liquidate. Debtor also used this facility to perform services for LMCI. LMCI reimbursed the Debtor for expenses incurred by the Debtor and its employees on behalf of LMCI from approximately May 1984 through February 1985 but did not do so [*5] thereafter. After February 1985, and pursuant to another oral agreement between David and Charles, LMCI offset what it owed Debtor as reimbursement against rent arrearages which Debtor owed Charles. The amount set off, which Equibank seeks to recover, is $ 26,409.32 for the period between February 1985 and January 1986.

At all times relevant to the instant proceedings the Debtor and LMCI were fifty percent co-owners of a piece of heavy machinery known as a Birdsboro Straightener which was stored at Specialized Equipment Systems, Inc., in Pomona, California. Debtor paid the monthly storage charges in the amount of $ 926.80 and in turn invoiced LMCI for its one-half share of the charges. LMCI paid its share of the charge to Debtor for a period of time but did not pay from July 1985 through January 1986. The testimony at trial established that David and Charles again had agreed orally that LMCI's share of the storage charges would be set off against accrued rents. As of the date of the filing of the bankruptcy petition, the total amount of LMCI's unpaid share of the storage charges was $ 3,243.80.

Equibank also seeks to recover from LMCI the balance due on a sale of equipment to LMCI [*6] by Debtor. On or about December 4, 1985 LMCI issued a purchase order to the Debtor with respect to four pieces of equipment. The terms of the purchase order stated that the total purchase price was $ 22,500.00 with "50% (11,250.00) cash due on shipment". Lang Exhibit H. Debtor delivered and invoiced the machinery to LMCI and LMCI issued a check to the Debtor in the amount of $ 11,250.00. Of that sum Debtor paid $ 11,000.00 to other co-owners of the equipment. LMCI has not paid the remaining $ 11,250.00 due the Debtor for this equipment claiming yet another agreement to set off against rents. The purchase order made no reference to an agreement permitting an offset.

The court finds that all setoffs claimed by LMCI were improper as LMCI was not entitled to any rent payments from Debtor. Debtor's lease, introduced into evidence as part of Lang Exhibit E, was with Charles and not with LMCI. Charles contended at trial that years ago he and LMCI had executed a master lease which had the effect of assigning to LMCI the lease between Charles and Debtor, but no such master lease was produced. The court therefore relies on the credible testimony which established, in effect, that LMCI served [*7] as the property manager for Charles by paying expenses, collecting rents, and so forth, and, in turn, remitted a set sum to Charles monthly.

Furthermore, on or about February 3, 1986, Charles, not LMCI, confessed judgment against the Debtor with respect to the rented premises based on delinquent rents and on February 12, 1986, Charles assigned the judgment to LMCI. Lang Exhibit G.

Paragraph 4 of the Complaint and Confession of Judgment, n1 Lang Exhibit E, stated that there had been no assignment or transfer of the lease, yet Charles testified at trial on these adversary matters that a transfer had been made to LMCI via the alleged master lease. To

credit this testimony would grant an advantage to a litigant who, in separate and unrelated actions, has propounded under oath irreconcilable versions of the same event.

n1 Attached to this document, which was signed by LMCI's counsel, is an affidavit signed by Charles attesting to the veracity of the statements in the complaint.

Significantly, no master lease was produced in the adversary proceeding. There is no independent basis upon which to find that there was a master lease, the existence of which was negated by its proponent in [*8] the confession of judgment proceedings. The court therefore finds that even if an executed document called a "master lease" existed, it was not an assignment of the Debtor's lease to LMCI but was, at best, a management agreement between Charles and LMCI. Therefore, LMCI had no entitlement to the rents and, correspondingly, no right to set off its debt against rents.

Moreover, in the order of August 29, 1986, confirming the bankruptcy sale of certain equipment and machinery, discussed infra, the court awarded to Charles, not to LMCI, $ 25,000.00 from the sale proceeds "for administrative rent from the beginning of time up to November 1, 1986". See Order of August 29, 1986, at Adversary No. 86-0356. Charles also obtained complete ownership of an overhead crane located at Debtor's place of business in settlement of the rent claims. The award of rent to Charles was based in part on the fact that the answer to the sale complaint alleged that he was the owner and lessor of the property.

Assuming, without deciding, that § 553 of the Bankruptcy Code applies in a situation where the Debtor is not a party, the court finds that the assignment by Charles to LMCI of the confessed judgment [*9] for delinquent rents was for the purpose of creating a right to setoff inasmuch as LMCI had no prior right to the delinquent rents. Charles, as landlord, knew of Debtor's intent to liquidate and, as president of LMCI, knew that LMCI owed Debtor money for services performed by Debtor. Other than the alleged existence of a master lease, no explanation was offered for the assignment of the judgment. In light of this court's ruling with respect to the master lease, the most reasonable inference to be drawn from the evidence is that the assignment of the judgment by Charles to LMCI was made for the purpose of providing LMCI with a vehicle by which an offset of its debt to Debtor could be accomplished. Although § 553(a)(3) addresses only the invalidation of a setoff in a situation where a creditor incurs a debt to a debtor in order to obtain a right of setoff, n2 this court will not permit orchestration of a setoff situation where it is clear, as it is in this case, that the intention is to create a debtor-creditor relationship and thus bootstrap the creditor's position to the detriment of others with a prior right.

n2 Additional requirements are that the debt must be incurred within ninety days pre-petition while the Debtor is insolvent.

[*10]

There is an independent ground upon which to deny LMCI a setoff under § 553, assuming once again that § 553 is applicable. Section 553(a)(2) provides in part:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that . . . (2) such claim was transferred, by an entity other than the debtor, to such creditor . . .

(B)(i) after 90 days before the date of the filing of the petition; and
(ii) while the debtor was insolvent . . . .

"Transfer" is defined broadly in the Bankruptcy Code to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . ." 11 U.S.C. § 101(50). "Claim" likewise is given an expansive definition, 11 U.S.C. § 101(4), and, pursuant to these definitions, both the confession of judgment and the assignment of the judgment constitute [*11] a transfer of a claim. Because the judgment was confessed and assigned within 90 days before the filing of the bankruptcy petition and the presumption of insolvency of the Debtor was not rebutted, 11 U.S.C. § 553(c), LMCI is prohibited from making a setoff under § 553(a)(2). See also 4 Collier on Bankruptcy para. 553.04[2] (15th ed. 1988). n3

n3 Although the issue was not raised, it appears from the record that the confession and assignment of the judgment also were preferential transfers under 11 U.S.C. § 547.

The court further finds that a setoff is prohibited because the requisite element of mutuality is absent in that the debts between Debtor and Charles and between LMCI and Debtor were not "in the same right and between the same parties, standing in the same capacity." 4 Collier on Bankruptcy para. 553.04[2] (15th ed. 1988). Mutuality requires that "each party must own his own

claim in his own right severally, with the right to collect it in his own name against the debtor in his own right and severally." *In re Virginia Block Co., 16 B.R. 771, 774 (Bankr. W.D. Va. 1982)*. See also *In re Virginia Block Co., 16 B.R. 560, 562 (Bankr. W.D. Va. 1981)*. In the case at [*12] hand Charles' standing as a creditor arose because he was Debtor's landlord and was owed rent. LMCI, on the other hand, was neither Debtor's landlord nor a creditor of Debtor. Its business dealings with Debtor were unrelated to Debtor's rental of its operating facilities and resulted in LMCI owing money to Debtor. Mutuality can be found only where the creditor owes the Debtor and the Debtor owes the creditor. *In re Ohio-Erie Corp., 22 B.R. 340, 342 (Bankr. W.D. Ohio, 1982)*. In this case, Debtor owed Charles and LMCI owed Debtor. No mutual debtor-creditor relationship existed, and, perhaps more significantly, Charles' rent claim has been satisfied as a result of the court's Order awarding him rent "from the beginning of time." n4

n4 See Order of August 29, 1986, at Adversary No. 86-0356. Although the Order also referred to "administrative rent", the Court's reference to "the beginning of time" seems to negate the appellation. The issue of rent apparently arose in a verbal context at the sale hearing inasmuch as Charles answer filed to the motion to sell in that Adversary makes no reference to a rent claim as such. Therefore, based on the information available from the record of the case and from the evidence adduced at trial, this Court finds concludes that Charles' entire rent claim has been satisfied.

[*13]

LMCI asserts a right to setoff through a triangular arrangement. For a valid "triangular" setoff to exist, Debtor must have formally agreed to permit LMCI and Charles to aggregate debts. *In Re Virginia Block Co., 16 B.R. at 562;* 4 Collier on Bankruptcy para. 553.04. Notwithstanding the allegation of an oral agreement to setoff various liabilities, there was no evidence introduced to prove the existence of this type of agreement and the court finds that the requisite formality did not exist. Because strict construction of § 553 is required, LMCI's arguments fail. See *In Re Virginia Block Co., 16 B.R. at 562.*

Based on the foregoing, LMCI is not entitled to set off what it owes to Debtor as reimbursement against the rents which Debtor owed to Charles. Thus, LMCI must remit to Equibank, which stands in Debtor's shoes, the storage charge for the Birdsboro Straightener and the balance due on the sale of equipment evidenced by the December 4, 1985 purchase order.

LMCI V. EQUIBANK

The court now addresses the counterclaim LMCI has asserted against Equibank in the amount of $ 750.00 for its costs in dismantling and shipping a Thompson Surface Grinder on which Equibank had a lien. n5 [*14] LMCI contended that Equibank, through counsel, agreed to pay these costs and to release its lien on the grinder so that LMCI could consummate a sale to a third party. The evidence adduced at trial did not support this contention. It showed only that Equibank had consented to LMCI's sale of the equipment. See Equibank's Exhibits 34, 35, and Transcripts of March 1, 1988, pages 66-80. LMCI failed to meet its burden of proof and therefore the counterclaim is rejected for insufficient evidence.

n5 The grinder was neither an asset of Debtor's estate nor a part of the 1986 sale conducted in the bankruptcy court, but the counterclaim is addressed pursuant to the parties' consent to entry of a final order by this court.

EQUIBANK V. HILDEBRAND

With respect to the action against Hildebrand, Equibank first contends that it is entitled to recover the sum of $ 5,933.10 in unpaid storage charges.

The evidence established that after Debtor decided to terminate operations, David notified Hildebrand that the Debtor would not renew its lease with Charles and that Charles henceforth would assess a fee for equipment stored on the premises. Hildebrand paid its portion of that fee to Debtor, [*15] apparently having inferred that Debtor, in turn, would pay Charles. Hildebrand ceased paying in May 1985, after learning from Charles that he had not received any part of the payments.

Charles testified at trial but did not confirm or deny whether he required storage charges to be paid; rather, he testified that any storage fees paid to Debtor had not been turned over to him. See Transcript of March 2, 1988 at pages 10-11. The weight of the evidence established that Debtor's, Hildebrand's and LMCI's practice was to house co-owned equipment at each other's facilities without charge. The court finds from the testimony that the imposition of storage charges was a unilateral act by David and that Hildebrand was not obligated to pay such charges. Furthermore, if any had been owed, they would have been payable to Charles as landlord, not to Debtor, and would not be assets of this estate. Correspondingly, Hildebrand does not owe storage charges to Equibank as Debtor's successor in interest.

Equibank next claims entitlement to Debtor's share of the proceeds of sale of a Landis Plane Cylindrical Grinder. Hildebrand held a two-thirds ownership interest

and Debtor, a one-third ownership [*16] interest in this piece of equipment. In December, 1985 or January, 1986, Hildebrand sold the grinder in the ordinary course of business to a third party for approximately $ 52,000.00. See Transcript of March 1, 1988, at pages 41-44. Debtor never received its share of these proceeds. Hildebrand contends that it does not owe Equibank as Debtor's successor in interest because it had a verbal "bailment" agreement with Debtor concerning the machinery and equipment sold in the 1986 bankruptcy sale. Hildebrand alleged that under this agreement Debtor was required to permit a sale of jointly-owned equipment or machinery only through "negotiated sale[s] for the maximum profit." See Hildebrand's pretrial statement and transcript of March 1, 1988 at pages 40-52. Hildebrand argued that Debtor breached this agreement inasmuch as the bankruptcy sale was not the result of negotiations, the amount realized therefrom was insufficient to maximize profit, and the sale forced Hildebrand to take on an unwanted partner n6 in the form of Equibank. n7 For the reasons which follow, these arguments are without merit, and Hildebrand must pay $ 17,333.33 to Equibank, which amount represents Debtor's one-third [*17] ownership interest in the grinder. n8

n6 The fact that a secured creditor, herein Equibank, pursues its security and thereby interferes with co-owners' wishes does not constitute a forced partnership. Furthermore, through the sale conducted in the main bankruptcy case, Hildebrand had remedies which it failed to utilize.

n7 LMCI raised the same arguments in defense to Equibank's claims against it and the discussion concerning the bailment argument applies equally to LMCI. The Court notes that the only written objection to the sale, filed by Charles, did not include the arguments raised in this adversary proceeding. If such arguments were raised, they were mooted by the Order confirming the sale and the failure of Hildebrand or LMCI to appeal. See Adversary No. 86-0356.

n8 Although the parties referred to $ 18,333.33 Hildebrand's representative's testimony at trial that the sale price was $ 52,000.00 was not contradicted. Thus Debtor's one-third share is $ 17,333.33.

*Section 541(c)(1) of the Bankruptcy Code* provides that any interest of a Debtor in property becomes property of the estate notwithstanding an agreement or non-bankruptcy law to the contrary. Thus, a restriction [*18] or condition prohibiting transfers by the Debtor of its interest in property or provisions that are conditioned on

Debtor's insolvency, financial condition, commencement of a bankruptcy case and similar events are ineffective in a bankruptcy context. *11 U.S.C. § 541*(c)(1)(A), (B).

*Section 363 of the Bankruptcy Code* also provides some guidance in this area. Section 363(c)(1) permits use, sale or lease of estate property in the ordinary course of the Debtor's business. Although the procedure may have been different from that which the co-owners would have employed outside of bankruptcy, the fact remains that Debtor was in the business of reselling equipment and did just that in this case. In addition, Section 363(h) permits a sale of the Debtor's and any co-owners' interests if certain conditions are met. Because the bankruptcy sale was confirmed two years ago, the presumption that all conditions were met is conclusive. No appeal was taken, and Hildebrand cannot change the law of this case by collaterally attacking the ruling in the sale proceeding.

The court further notes that the sale was advertised and noticed in accordance with the Bankruptcy Code and Rules and, in the context of [*19] a hearing before Judge Markovitz, appropriate measures were taken to maximize bidding so as to achieve the best price. In addition, both Hildebrand and LMCI were present at the hearing on the sale about which they now complain. At the trial on the adversary proceedings they admitted that the prices they bid at the sale hearing were far less than what they now contend was the fair market value and upon which the setoff defense is based, in part. For example, Hildebrand's representative testified that Hildebrand bid $ 2,100.00 for a vertical boring mill in which its half interest was worth $ 55,333.00. Transcript of March 1, 1988, pages 50-51. Hildebrand and LMCI were the successful bidders with respect to various pieces of equipment Other equipment upon which Hildebrand and LMCI did not bid was bought by unrelated entities. Charles testified that lMCI did not bid on its co-owned equipment Transcript of March 1, 1988 at pages 48-49. Neither LMCI nor Hildebrand filed written objections to the sale and, if any oral objections were made at the sale hearing, they were overruled, as evidenced by the entry of an order confirming the sale. No appeal was taken from that order and this court [*20] will not now permit LMCI and Hildebrand to litigate collaterally matters which were cognizable at the sale hearing. Hildebrand's and LMCI's complaints about a situation which they were instrumental in creating, i.e., the profit to be realized from proceeds of the sale, will not now be sanctioned. n9 Hildebrand's liability to Debtor for Debtor's share of the purchase price of the Landis Plane Cylindrical Grinder is not negated by anything cognizable in the present posture of this case. The Order confirming the sale provided that all liens and claims against the property sold were to be transferred to the proceeds of sale. Any claims which exist against this fund by any former

co-owners of the equipment and machinery which was sold will be decided at the appropriate time in the main bankruptcy

> n9 The court also notes that before the bankruptcy petition was filed and before the 1986 bankruptcy sale took place Hildebrand had made and withdrawn an offer of $ 110,000.00 for all equipment located at Debtor's business premises (Hildebrand Exhibits C, D).

In summary, the bailment and related arguments are rejected. The court finds that Hildebrand and LMCI had ample opportunity in the [*21] context of the sale proceeding to take whatever steps they saw fit to guard against a shortfall in the proceeds of sale. They failed to do so and now are estopped from challenging the status quo.

CONCLUSION

At Adversary No. 87-0347 judgment will be entered for Equibank on its claim against LMCI for storage charges for the equipment stored in Pomona, California, in the amount of $ 3,243.80, and for reimbursement of expenses to the Debtor in the amount of $ 26,409.32. Further, Equibank is entitled to the balance of the purchase price represented by the December 4, 1985, pur-

chase order which is $ 11,250.00. LMCI's counterclaim against Equibank for $ 750.00 was not supported by the evidence and will be dismissed. At Adversary No. 87-0346 Equibank's $ 5,933.10 claim against Hildebrand for storage charges will be dismissed. However, judgment will be rendered for Equibank and against Hildebrand in the amount of $ 17,333.33, representing Debtor's share of the resale price of $ 52,000.00 of the Landis Plane Cylindrical Grinder.

An appropriate Order will be entered.

ORDER

And now, to-wit, this 19th day of October, 1988, for the reasons expressed in the foregoing Memorandum Opinion, it is ORDERED: [*22] At Adversary No. 87-0347 judgment is entered for Equibank and against Lang Machinery Company, Inc. in the amount of $ 40,930.12 plus interest. Lang machinery Company's counterclaim is dismissed;

At Adversary No. 87-0346 judgment is entered for Equibank and against Hildebrand in the amount of $ 17,333.33, which is the proportionate share of proceeds of sale of equipment plus interest. However, Equibank's claim against Hildrebrand for storage charges is dismissed.

All parties to bear their own costs.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARDEN RIDGE CORPORATION, *et al.,* | ) | Case No. 04-10324 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |
| | ) | |
| DANIEL FERGUSON, | ) | |
| | ) | |
| | ) | Case No. 06-CV-213 (GMS) |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARDEN RIDGE CORPORATION, *et al.* | ) | |
| | ) | |
| Appellees | ) | |
| | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

      I, Joseph M. Barry, Esquire, hereby certify that I am not less than 18 years of age and that on July 20, 2006, I caused a copy of the attached **Brief of Appellees Garden Ridge Corporation, *et al.*** to be served, via hand delivery, upon the following counsel to the Appellant:

William D. Sullivan, Esq.
Buchanan Ingersoll, P.C.
The Nemours Building
1007 N. Orange Street
Suite 1110
Wilmington, DE 19801

_____
Joseph M. Barry (No. 4221)

Dated: July 20, 2006